RED R. S. S. CO., Limited, v. NORTH AMERICAN TRANSPORT CO.

(District Court, S. D. New York. January 6, 1898.)

1. CHARTER OF STEAMER—LAY-DAYS—DISPATCH MONEYS—TIME SAVED IN LOADING.

A charter of the steamship William Storrs to the defendants, allowed for loading 15 running days; Sundays and holidays excepted, and dispatch money £10 per day for each day or part of a day saved in loading. The master permitted the charterers to commence loading with the use of the ship's appliances on the day preceding the time when the lay-days by the charter began, without prejudice to the continuance of the lay-days. *Held*, that the time used by the charterers in loading on the day preceding the commencement of the lay-days, was not time saved in loading, and that the charterers could not, therefore, claim dispatch money for that time.

2. SAME—DETENTION OF SHIP'S PAPERS.

Under a second charter of the same steamer, 18 running lay-days were allowed, Sundays and legal holidays excepted, with the provision for dispatch moneys at £15 per day "if steamer be dispatched in less time than is specified." *Held* under this provision of the charter that the right to dispatch moneys would begin on the day the ship was actually dispatched by the charterers, notwithstanding their use of the ship by permission for loading before the lay-days commenced. *Held*, further, that under a charter providing for bills of lading and a delivery of the cargo according to the custom of the port, the charterers had no right to require the master to sign bills of lading containing more specific provisions as to a particular alleged custom of which the master was ignorant, or to detain the vessel on account of his refusal to sign such bills, although the custom was in fact correctly stated, and the dispatch moneys, therefore, could not be claimed for the time lost in dispatching the ship on account of this controversy.

(Syllabus by the Court.)

This was a libel in rem by the Red R. Steamship Company, Limited, against the North American Transport Company, to recover money claimed under a charter party.

Convers & Kirlin, for libelant.

Butler, Notman, Joline & Mynderse, for respondent.

BROWN, District Judge. The above libel was filed to recover certain small balances alleged to be due to the libelant for the hire of the steamship William Storrs under two different charter parties, dated the one July 26, 1893, and the other October 10, 1893. The items claimed consist of certain credits for dispatch moneys, which in settlement with the charterers the master allowed to them as credits against the charter hire. for time saved in loading, and in dispatching the vessel less than the lay-days specified in the charter. The charter of July provided that:

"The lay-days shall not commence until 7 a. m. on the morning after the steamer is ready to receive the cargo at the place of loading, notice being given before 12 o'clock on the day the steamer is ready. 15 running days, Sundays and holidays excepted, are allowed for loading. * * * Dispatch money at the rate of £10 per day of 24 hours is to be allowed the charterers for each running day or part of day saved in loading. The vessel is to load at night if required by the charterers, they paying all extra expense thereby incurred excepting overtime of officers and crew; steamer to furnish use of her tackle, steam hoisting engines and engine drivers in landing [loading?] cargo."

The vessel was ready to load and gave the requisite notice on August 22d, so that the lay-days, according to the terms of the charter, began at 7 a. m. of Wednesday, August 23d. Fifteen running days from that time, Sundays and holidays excluded, expired at 7 a. m. on Monday, September 11th, to which time the charterers would have been entitled to hold the ship for the purpose of loading, without any liability for the payment of demurrage. In this computation, three Sundays are excluded, and also Labor Day, on September 4th, which under the statutes and customary practice at Norfolk, Va., where the ship was loaded, I find should be treated as a holiday within the provisions of the charter.

By arrangement with the master, however, the charterers commenced loading on Tuesday, August 22d, at about 2 p. m., the day before the lay-days regularly commenced under the charter, but with the understanding that the earlier commencement to load should not affect the duration of the lay-days. Nothing was said regarding the effect of the earlier commencement of loading upon the right to dispatch moneys. The loading was completed at half past 4 p. m. on Saturday, September 2d, and the vessel sailed the next morning. In the settlement for the charter hire the master allowed the charterers' claim to a credit of 8 days and 14 hours dispatch moneys, making no account of the time used in loading on August 22d. The libelant contends that by commencing to load on the 22d, the lay-days must be counted from that time, and that the lay-days therefore expired on Saturday, the 9th of September (even if Labor Day were allowed as a holiday), instead of on Monday, the 11th; and that the master had no authority to modify the charter party, or to permit the charterers to commence loading earlier than the charter party provided, upon any terms that would throw upon the owners the expense of additional dispatch moneys.

I do not think the master's permission to commence loading earlier than the charter party provided, should be regarded as an act done in excess of his authority; nor on the other hand should this permission, in the absence of express agreement, be so construed as to authorize the charterers to use the ship and her appliances for loading without compensation or equivalent in reckoning, or so as to impose the payment of dispatch moneys beyond what would otherwise have been due. The charterers cannot claim dispatch moneys except in strict accordance with the express stipulation of the charter. This stipulation in the July charter is, that dispatch moneys shall be allowed for each running day or part of day "saved in loading." But, plainly, a day is not saved in loading that is occupied in loading. While loading, the ship's officers, men, steam and tackle

are at the charterers' service and are more or less employed.    In this charter I have some doubt whether the word "landing" is not a misprint for "loading," which is the word used in the subsequent charter; but the practice of vessels to supply these facilities is well known, and the previous provision of this charter that for loading at night, the charterers should "pay all extra expenses excepting overtime of officers or crew," indicates that the general custom in this case was to be followed.    The expenses of the ship while loading, though perhaps but a minor part of the consideration in the allowance of dispatch moneys, cannot be wholly ignored; nor can they be separated from the other consideration for the allowance of dispatch moneys.    Consequently, under the first charter, the whole time that the charterers occupied in loading, from the hour when they began to load up to the hour when the loading was finished, should be counted against them as time used in loading, and none of it as time "saved in loading."    This whole time, including one Sunday, was 11 days, $2\frac{1}{2}$ hours.    The lay-days as provided by the charter counted 18 running days, and the understanding with the master was that these should not be shortened by beginning to load on the 22d instead of the 23d.    The lay-days remained, therefore, up to 7 a. m. of September 11th, as before.    But this on the other hand has no effect on the time actually saved or used in loading.    The time used in loading being 11 running days and $2\frac{1}{2}$ hours, and the time allowed by the charter counting 18 days in all, the difference, viz. 6 days, $2\frac{1}{2}$ hours, is the time "saved in loading," beyond that contemplated by the charter.    This is all that the owners agreed to pay for; since they did not agree, as in the succeeding charter, to pay for any time saved in the dispatch of the ship sooner than the 18 days.    The charterers were, therefore, entitled under the first charter to dispatch moneys for 1 day, $16\frac{1}{2}$ hours, less than the 8 days, 14 hours, charged in their settlement with the master.

2. The provisions of the second charter, dated October 10, 1893, were the same as regards giving notice and the commencement of lay-days; but as respects dispatch moneys the provision was different from that of the preceding charter.    It was as follows:

"If the steamer be not sooner dispatched, 18 running days, Sundays and legal holidays excepted, shall be allowed the charterers for loading. * * * And if steamer be dispatched in less time than is specified, then the charterers are to be allowed £15 British sterling dispatch money for each and every working day so saved."

The vessel loaded at Newport News.    The ship was in readiness and gave notice on October 18th, so that the lay-days of the charter commenced Thursday, October 19th.    At the charterers' request, the master gave permission to begin loading on the 18th, and signed this memorandum:

"Agree commence loading to-day 18th instant, time to commence to begin 7 a. m. to-morrow 19th.
"[Sgd]                                                              J. Daniels."

The vessel accordingly commenced loading at 2 o'clock on October 18th, and finished loading at 7 p. m. on Thursday, October 26th.    She, therefore, occupied in loading (deducting one Sunday) 7 days, and 5

hours of actual working days, while the charter time allowed was 18 working days, a saving in loading time, therefore, equal to 10 days and 19 hours, for which the charterers would have been entitled to credit if the provision of this charter had been that they were to be paid for the time "saved in loading." This charter, however, reads that they are to be paid in case only that "the steamer be dispatched in less time than is specified." The time specified is 18 running days, Sundays and legal holidays excepted, which, under the notice, counts from October 19th, and it is expressly provided in article 11 that the charter shall not commence until that day. The lay-days, therefore, excluding three Sundays, expired at 7 a. m. on November 9th, and the right to dispatch moneys depends upon the charterers' "dispatch of the ship" prior to that time. There is no express reference to the completion of loading, or time saved in loading or in other ways.

After the loading was completed, on the evening of the 26th, a dispute arose between the master and the charterers' agents as to the terms of the bills of lading. The bills of lading were prepared by them, and, as presented to the master for signature, contained, as regards certain tobacco, the following clause:

"Tobacco to be delivered at Queen's Warehouse at ship's expense."

The charter provided "that the customs and usages at the ports of loading and dispatching shall be observed, unless otherwise expressed." Article 7. "Tobacco, if any, to be delivered according to the custom of port of discharge; charterers guaranty not to ship exceeding 100 hogsheads." Article 9. The master at once signed all the other bills of lading as presented, but objected to the above clause, which would require the ship to pay the expenses of cartage to the warehouse in Liverpool. He offered to sign bills of lading in the form provided by the charter party as above stated. The respondents would not accept this, and refused to deliver to the captain the necessary clearance papers of the ship, in consequence of which the ship was detained until the evening of October 28th, when the bills of lading were accepted in the form proposed by the master, and the ship's clearance papers were delivered, so that she sailed on the morning of the 29th.

The custom of Liverpool required the ship to pay the expenses of warehousing, and this charge was in fact subsequently paid. But the master, while at Norfolk, could not be required to ascertain and determine at his peril the fact as to this custom, and insert it in the bills of lading. The provisions of the charter party were explicit as to the bills of lading, and were sufficient; and the respondents had no right to insert additional specifications, which were not in the charter, and which the master did not have immediate means of determining. The detention of the vessel during this dispute was not, therefore, justifiable on the part of the respondents; and so long as they withheld the ship's clearance papers without justifiable cause, manifestly the ship was not "dispatched." The dispute on this matter was not adjusted until so late on the 28th that no pilot could be obtained until the 29th. This charter, moreover, does

not provide for any division of a day. The vessel was, therefore, dispatched but 9 working days earlier than the lay-days stipulated in the charter, and for these 9 days only were the respondents entitled to dispatch moneys, instead of 11 days.

I find, therefore, that the libelant is entitled to be restored dispatch moneys under the first charter, for 1 day and 16½ hours, and under the second charter for 2 days.

Judgment may be entered accordingly, with interest and costs.