RED "R" S. S. CO., Limited, v. NORTH AMERICAN TRANSPORT CO.

(Circuit Court of Appeals, Second Circuit.    December 7, 1898.)

No. 24.

1. SHIPPING—CONSTRUCTION OF CHARTER—COMPUTATION OF DISPATCH MONEY.
    Under a charter specifying the number of days allowed for loading, exclusive of Sundays and holidays, and providing that dispatch money is to be allowed the charterer for "each running day or part of a day saved in loading," dispatch money is to be computed on the difference in time between the time the loading was actually completed and the vessel turned over to the master for the purpose of the voyage and the time when the lay days for loading would have expired under the charter, including Sundays or holidays occurring during such time.

2. SAME—DETENTION OF VESSEL BY CHARTERER.
    Under a charter provision that, if the vessel should "be dispatched" in less time than was specified for loading, the charterers should be allowed dispatch money for each working day so saved, the charterers are not entitled to dispatch money for time elapsing after the vessel was actually loaded, but during which she was detained by their withholding her clearance papers without justifiable cause.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by the Red "R" Steamship Company, Limited, against the North American Transport Company, to recover money claimed under a charter party.    From the decision of the district court (84 Fed. 467), the respondent appeals.

Wilhelmus Mynderse, for appellant.

J. Parker Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge.    This is an appeal by the respondent from the decree of the district court for the Southern district of New York.    The important facts in the case were not in dispute.    Those in regard to the first item which the libelant sought to recover are stated in Judge Brown's opinion (84 Fed. 467) as follows:

"The libel was filed to recover certain small balances alleged to be due to the libelant for the hire of the steamship William Storrs under two different charter parties, dated, the one July 26, 1893, and the other October 10, 1893. The items claimed consist of certain credits for dispatch moneys which, in settlement with the charterers, the master allowed to them as credits against the charter hire, for time saved in loading and in dispatching the vessel, less than the lay days specified in the charter.    The charter of July provided that the lay days shall not commence until 7 a. m., on the morning after the steamer is ready to receive the cargo at the place of loading, notice being given before 12 o'clock on the day the steamer is ready.    15 running days, Sundays and holidays excepted, are allowed for loading. * * * Dispatch

money at the rate of £10 per day of twenty-four hours is to be allowed the charterers for each running day or part of day saved in loading. The vessel is to load at night if required by the charterers, they paying all extra expense thereby incurred, excepting overtime of officers and crew; steamer to furnish use of her tackle, steam hoisting engines, and engine drivers in landing [loading?] cargo.' The vessel was ready to load and gave the requisite notice on August 22d, so that the lay days, according to the terms of the charter, began at 7 a. m. of Wednesday, August 23d. Fifteen running days from that time, Sundays and holidays excluded, expired at 7 a. m. on Monday, September 11th, to which time the charterers would have been entitled to hold the ship for the purpose of loading, without any liability for the payment of demurrage. In this computation, three Sundays are excluded, and also Labor Day, on September 4th, which, under the statutes and customary practice at Norfolk, Va., where the ship was loaded, I find should be treated as a holiday within the provisions of the charter. By arrangement with the master, however, the charterers commenced loading on Tuesday, August 22d, at about 2 p. m., the day before the lay days regularly commenced under the charter, but with the understanding that the earlier commencement to load should not affect the duration of the lay days. Nothing was said regarding the effect of the earlier commencement of loading upon the right to dispatch moneys. The loading was completed at half past 4 p. m. on Saturday, September 2d, and the vessel sailed the next morning. In the settlement for the charter hire, the master allowed the charterers' 'claim to a credit of 8 days and 14 hours dispatch moneys. making no account of the time used in loading on August 22d.' "

The libelant's principal theory in regard to the alleged overcharge upon the July charter was that, as loading commenced on the 22d, the lay days commenced also on that day, and therefore expired on September 9th instead of September 11th, and that, 11 days having been occupied in loading, 4 only of 15 lay days were saved. The district judge properly held that the lay days were not to commence in violation both of the terms of the charter and of the oral agreement with the master, and that dispatch moneys were also to be allowed in accordance with the terms of the charter. The question in controversy was therefore in regard to the meaning of the term, "running days saved in loading." The district judge thought that the whole time occupied in loading, from 2 p. m., August 22d, to 4:30 p. m., September 2d, being 11 days, $2\frac{1}{2}$ hours, was the time used in loading; and that the only time saved in loading was the difference between the amount of time used and the 18 running lay days, being 6 days, $21\frac{1}{2}$ hours. He therefore held that the libelant was entitled to a return of dispatch moneys for 1 day, $16\frac{1}{2}$ hours.

We are of opinion that the "time saved in loading" means the amount of time saved to the vessel from the time allowed for loading by the charter, and that, as loading was completed on September 2d, at 4.30 p. m., the dispatch days then commenced, and ran to September 11th, at 7 o'clock a. m., being 8 days and 14 hours, in accordance with the dispatch statement. The charter specifies how many days are allowed for loading, and then provides that dispatch money is to be allowed to the charterers for each day and part of a day saved in loading. This means that, if the charterers can turn the vessel over to the master for the purpose of the voyage before the time permitted to them for loading, there shall be an allowance for each day and part of a day thus saved to the owners. This computation allows dispatch money for the Sundays and holidays between the completion of loading and the

expiration of the lay days, and is in accordance with a proper construction of the charter. The term, "running days saved in loading," not "running days, Sundays and holidays excepted," nor "working days," meant the amount of consecutive days which should be saved to the ship and its owners before the end of the time which the charterers were permitted to occupy in loading. This construction was apparently approved by both counsel and court in Laing v. Hollway, 3 Q. B. Div. 437, but the decision turned upon the duration of a day, whether 12 or 24 hours. The Glendevon [1893] Prob. Div. 269, is not an authority of value to the libelant, because the question turned upon the peculiar phraseology of the dispatch clause.

The provisions in the October charter in regard to dispatch moneys differed from those of the preceding charter, while in regard to the commencement of lay days and the giving notice they were the same. The dispatch money clause was as follows:

"If the steamer be not sooner dispatched, 18 running days, Sundays and legal holidays excepted, shall be allowed to the charterers for loading. * * * And, if steamer be dispatched in less time than is specified, then the charterers are to be allowed £15 British sterling dispatch money for each and every working day so saved."

Judge Brown finds as follows in regard to the time spent in loading:

"The vessel loaded at Newport News. The ship was in readiness and gave notice on October 18th, so that the lay days of the charter commenced Thursday, October 19th. At the charterer's request, the master gave permission to begin loading on the 18th, and signed this memorandum:

" 'Agree commence loading to-day, 18th instant, time to commence to begin 7 a. m. to-morrow, 19th.

" '[Signed]                                                    J. Daniels.'

"The vessel accordingly commenced loading at 2 o'clock on October 18th, and finished loading at 7 p. m. on Thursday, October 26th. She therefore occupied in loading (deducting one Sunday) 7 days and 5 hours of actual working days, while the charter time allowed was 18 working days."

The lay days expired at 7 a. m. on November 9th, "and the right to dispatch moneys depends upon the charterer's dispatch of the ship prior to that time." On the evening of the 26th, and after the loading was completed, the charterers presented to the master bills of lading for his signature. Those in regard to tobacco contained the clause, "Tobacco to be delivered at Queen's Warehouse, at ship's expense." The charter contained the clause, "Tobacco, if any, to be delivered according to the custom of the port of discharge." The master objected to the clause which was presented, because he did not know the custom of the port of Liverpool, but was willing to sign bills of lading in the language mentioned in the charter. The charterers refused to accept this form, and refused to deliver the necessary clearance papers, so that the vessel was detained until the evening of October 28th, when bills of lading in accordance with the captain's proposal were accepted, and the ship sailed on the morning of the 29th. The dispatch settlement allowed 11 days, being from the morning of October 27th till the close of working hours on November 8th. The vessel was actually dispatched on the 29th. The libelants claim a repayment for two days, which was allowed by the district judge, because "the provisions of the charter party were explicit as to the bills of lading and were sufficient;

and the respondents had no right to insert additional specifications, which were not in the charter, and which the master did not have immediate means of determining. The detention of the vessel during this dispute was not, therefore, justifiable on the part of the respondents; and, so long as they withheld the ship's clearance papers without justifiable cause, manifestly the ship was not dispatched." The ship was ready to be dispatched on the 27th, and would have been, but for the unreasonable conduct of the respondents, which compelled the delay, and, having refused to dispatch the ship, they yet insisted upon dispatch money from the time she ought to have been dispatched. In regard to this part of the case we concur with the district judge.

Let the decree of the district court be modified, without costs of this court, so that the dispatch money shall be restored under the second charter only.