CLYDE COMMERCIAL S. S. CO., Ltd., v. WEST INDIA S. S. CO.

(Circuit Court of Appeals, Second Circuit. March 16, 1909.)

No. 169.

1. SHIPPING (§ 39*)—CHARTERS—CONSTRUCTION—DEMISE OF VESSEL.

A time charter of a steamer to be officered, manned, provisioned, maintained, and navigated by the owner, and to be placed at the disposal of the charterer to the extent of her cargo space, is not a demise of the vessel, although the charter party speaks of her "delivery" to the charterer.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 39.*]

2. SHIPPING (§ 39*)—CHARTERS—CONSTRUCTION OF CHARTER PARTY.

A provision in a charter party, which contains independent covenants to be performed by each party, that acts of God, enemies, perils of the seas, errors of navigation, etc., are mutually excepted, operates merely to relieve either party from liability to the other on account of the breach of any of such covenants on his part, where it results from any one of the excepted causes. Such exceptions do not apply, however, to a special provision for the suspension of charter hire for delay, resulting from any one of certain enumerated causes, many of which are the same as those specified in the exceptions.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 39.*]

3. SHIPPING (§ 49*) — CHARTER — DEDUCTION OF CHARTER HIRE—DETENTION OF VESSEL IN QUARANTINE—"DEFICIENCY OF MEN"—"RESTRAINT OF PRINCES OR PEOPLE."

The detention of a vessel under a time charter at an intermediate port on her voyage under a general quarantine regulation of the state because she came from a port which under such regulations was presumptively infected was not caused by a "deficiency of men" constructively or otherwise, within a clause of the charter party relieving the charterer from the payment of hire in case of delay from such deficiency, but was through "restraint of princes or people" within a provision mutually excepting such cause, and the charterer is entitled to no deduction therefor.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 49.*

For other definitions, see Words and Phrases, vol. 7, p. 6186.

Deductions and offsets from charter hire of vessel, see note to Tweedie Trading Co. v. George D. Emery Co., 84 C. C. A. 254.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Convers & Kirlin (J. Parker Kirlin and John M. Woolsey, of counsel), for appellant.

Wheeler, Cortis & Haight (Charles Haight and Clarence Bishop Smith, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. This is a libel by the owner of the steamship Santona to recover deductions made by the charterer from the charter hire. The charter party contains the following provisions material to be considered:

"The said owners agree to let and the said charterers agree to hire the said steamship from the time of delivery for six calendar months. Steamer to be placed at the disposal of the charterers at a safe U. S. Atlantic port. * * * It is understood that steamer is to come out in ballast * * * being on her delivery ready to receive cargo and tight, staunch, strong and in every way fitted for the service * * * (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage) and to be so maintained during the continuation of this charter party.

"(1) That the owner shall provide and pay for all provisions, wages, and consular shipping and discharging fees of the captain, officers, engineers, firemen and crew * * * also for all the cabin, deck, engineroom and other necessary stores and maintain her in a thoroughly efficient state in hull and machinery for and during the service.

"(2) That the charterers shall provide and pay for all the coals, fuel, port charges, pilotages, agencies, commissions, consular charges (except those pertaining to the captain, officers or crew) and all other charges whatsoever except those before stated."

"(4) That the charterer shall pay for the use and hire of said vessel 962 pounds ten shillings per calendar month commencing on and from the date of her delivery," etc.

"(6) Payment of said hire to be made in cash semimonthly in advance at New York * * * and in default of such payment or payments as herein specified the owner shall have the faculty of withdrawing said steamer from the service of the charterers without prejudice to any claim that the owners may otherwise have on the charterers in pursuance of this charter."

"(9) That the whole reach of the vessel's holds, decks, and usual places of loading and accommodation in the ship (not more than she can reasonably stow and carry) shall be at the charterers' disposal reserving only proper and sufficient space for ship's officers, crew, tackle, apparel, furniture, provisions, stores, and fuel.

"(10) That the captain shall prosecute his voyages with the utmost dispatch. * * *"

"(14) That the master shall use all diligence in caring for the ventilation of the cargo.

"(15) That in the event of the loss of time from deficiency of men or stores, breakdown of machinery, stranding, fire or damage preventing the working of the vessel for more than twenty-four running hours the payment of hire shall cease until she be again in an efficient state to resume her service. * * *"

"(17) The act of God, enemies, fire, restraint of princes, rulers and people and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation and errors of navigation throughout this charter party always mutually excepted."

"(21) Steamer is to be docked, bottom cleaned when an opportunity occurs in U. S. north of Hatteras or in Europe and payment of the hire to be suspended until she is again in proper state for the service. * * *"

It will thus be seen that the owner officered, manned, and provisioned the vessel, was in entire control of her navigation, and bound to maintain her during the charter party in good condition. The expression "delivery" of the vessel to the charterer and "delivery" by it at the end of the term to the owner is to be construed in connection with these provisions and with the further provision that she was to be "placed at the disposal of the charterers" to the extent of the space agreed upon. We entertain no doubt that the charter did not amount to a demise of the vessel. Reed v. United States, 78 U. S. 591, 20 L. Ed. 220; United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403. If she had been at fault for a collision during the term, it would scarcely be contended that the charterer would be personally responsible.

Irrespective of the special provisions and exceptions, there can be no doubt that, if the owner failed to perform any of its covenants, it would be responsible in damages to the charterer which might be measured in some cases by the charter hire and which in other cases might be more or less than the charter hire. If the charterer failed to perform its covenants, it would likewise be liable to the owner in damages, measured if the failure were in payment of the charter hire by the amount of hire unpaid with interest, or, if it were a failure to provide coals or pilots or pay port charges, measured by the amount of the damages so caused to the owner. The parties, however, did provide a series of exceptions in article 17 which are described as "mutual." We think this word cannot be construed in the sense of reciprocal in respect to the same broken engagement because the charter party contains no such reciprocal or interdependent covenants. The charterer makes no special covenant in consideration of the owner's undertaking to maintain the hull and machinery in good condition (1); to put the agreed space at the disposal of the charterer (9); to prosecute the voyage with dispatch (10); to ventilate the cargo (14); and to clean the ship's bottom (21). Its covenant to pay charter hire (4 and 6) is in consideration of the performance by the owner of all its covenants. Similarly the owner covenants nothing in special consideration of the charterer's undertaking to provide coals and pilotages and pay for port charges, etc. (2); all its covenants together being made in consideration of the charterer's single covenant to pay hire. By mutual we understand that the parties intended the exceptions to protect each from liability to the other whenever performance of any covenant was prevented or delayed by any exception. If the owner were prevented from maintaining the vessel in an efficient state or from giving the whole space contracted for or from prosecuting the voyage with dispatch or from properly ventilating the cargo or cleaning the ship's bottom by any of these exceptions, he would not be responsible to the charterer. On the other hand, if the charterer were so prevented from furnishing coals, paying port charges or furnishing pilots or from paying hire on the date fixed, it would be relieved from liability therefor to the owner, and, in the case of charter hire, the owner could not withdraw the steamer as provided in article 6.

If the causes enumerated in article 15 for which payment of hire is suspended were wholly different from the exceptions in article 17,

it might be fairly contended that those exceptions applied to them, but they include many categories exactly alike. If hire is to be suspended for delay over 24 hours caused by breakdown of machinery, that delay is immediately excused by the exception of accidents to machinery in article 17. Suspension in case of stranding is immediately excused, whether the owner is at fault or not, by the exception of accidents of the sea or errors in navigation; suspension in case of fire by the exception of fire. This leads us to the conclusion that article 15 must be understood to state absolute categories in which the parties intended the hire to be suspended whether the owner was at fault or not, and therefore that article 17 does not apply to them at all.

Hard cases may be imagined, but the question is what does the contract, as written, mean, and by it the parties must abide whether the results are hard or not. The vessel was detained at Colon after she had discharged her cargo, and before she proceeded on her voyage, one day 18½ hours. The master wrote to the charterer at the time that he had to remain because the second and third engineers, having developed fever, were too weak to attend to their duties; "so I had to remain, but hope to get away to-morrow morning." The master having lost the time because he had not, or thought he had not, a sufficient crew to proceed with (though subsequent events showed he was wrong in this particular), the delay was due to a deficiency of men under article 15, and the charterer was entitled to deduct charter hire for that time. The vessel was subsequently delayed 10 days and 20 hours at Sabine because of the quarantine laws of the state of Texas. The proclamation of the Governor by authority vested in him by the laws of that state declared every vessel coming from a port south of 25 degrees north latitude to "be considered infected unless proof to the contrary be submitted to the state health officer and special exemption be granted to said places. * * *" The Santona came from such a port, viz., Colon, and, as she was detained as infected, it is fair to assume that no such exemption had been granted to Colon. The proclamation further provided:

"Vessels from an infected place having had sickness or deaths en route, but having no sickness at the time of arrival, will be disinfected and held seven full days after disinfection under observation before being released and a longer time if considered necessary by the said health officer."

The Santona fell within this description, and her detention was prolonged after the first seven days because some new cases of fever appeared. The delay was not caused by a deficiency of men constructive or otherwise, as in the case of Tweedie Trading Co. v. Emery, 154 Fed. 472, 84 C. C. A. 253. In that case the crew were constructively deficient, just as the vessel in this case was constructively infected. There was, therefore, no deficiency of men within article 15.

Detention by quarantine authority is a restraint of princes or people. The Progresso (D. C.) 42 Fed. 229; Id., 50 Fed. 835, 2 C. C. A. 45; The Santona (C. C.) 152 Fed. 516; Carver on Carriage of Goods by Sea, § 82. Accordingly this exception which prevented the owner from prosecuting his voyage with dispatch relieves him from liability to the charterer for the delay so caused. The case is to be treated as if no

delay had occurred. On the other hand, the charterer is not protected by the exception from paying hire because it was not thereby prevented from paying hire and because it had the use of the vessel for which it was to pay notwithstanding the interruption. The case is not at all like that of Northern Pacific Railway Co. v. American Trading Co., 195 U. S. 439, 25 Sup. Ct. 84, 49 L. Ed. 269, in which a deputy collector, through his mistaken understanding of the law, refused a clearance to a steamer unless a shipment of lead which was contraband of war during the Chinese-Japanese War were first discharged. In that case there was no statute of the United States nor any proclamation of the President requiring clearance to be refused to a vessel having on board articles contraband of war. Mr. Justice Peckham said:

"Here there was no intervention of the government of the United States. The exportation of lead was never prohibited by the Treasury Department during the war between China and Japan. There was no change in the law or the policy of this government subsequently to the making of the contract by which its performance was excused. The exportation of the lead was legal when the contract was made and continued to be so after the execution of such contract, although the deputy collector mistakenly refused to grant the clearance unless the lead was taken off the vessel. Such mistaken decision did not render the original loading of the lead on the ship unlawful, nor would it have been unlawful for the ship to proceed with the lead on board provided the clearance had been had. It was not an act of the state, therefore, which prevented the sailing of the vessel within the true meaning of such a term, but a mistaken act of a subordinate official not justified by law, and not sufficient as an excuse for the nonperformance of the contract in question under the circumstances already detailed. If the bill of lading were regarded as applicable for this purpose, the refusal of the clearance did not constitute a 'restraint of princes, rulers or people,' within that clause of the bill."

The decree is reversed, and the court below directed to enter a decree for the libelant for the amount deducted from charter hire for delay at Sabine, with interest and one-half the costs of both courts.