POOL SHIPPING CO., Limited, v. SAMUEL et al.

(Circuit Court of Appeals, Third Circuit.   October 7, 1912.)

No. 1,601.

1. SHIPPING (§ 49*)—CHARTERS—DISPATCH MONEY.
    A provision in a charter party for the payment of dispatch money is for time saved to the ship, and should be construed as applying only to the time comprised between the time when the loading or discharging is actually completed and the time when the lay days expire.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. § 49.*]

2. SHIPPING (§ 49*)—CONSTRUCTION OF CHARTER—DISPATCH MONEY.
    A provision following the demurrage clause in a charter party, which also provides for dispatch money, that "all causes beyond the control of the shipper, consignee or the charterer which may prevent or delay the loading or discharging during the said voyage always mutually excepted," does not entitle the charterer to dispatch money for time during which the vessel was delayed without her fault in commencing to discharge, although she finished before the expiration of the lay days allowed, and the cause of the delay was one beyond the charterer's control, so that the time could not have been charged against him to render him liable for demurrage.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. § 49.*
    Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

3. SHIPPING (§ 50*)—CHARTER—COST OF MOVING VESSEL.
    A charterer is not liable for the cost of moving the vessel from one discharging berth to another, when the change was made by order of the commissioners of navigation of the port, and not at the charterer's instance or request.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 150–155; Dec. Dig. § 50.*]

4. SHIPPING (§ 49*)—CHARTER—"TIME SAVED IN LOADING."
    Under a charter providing that dispatch money is to be allowed the charterer for "time saved in loading," the phrase "time saved in loading" means the amount of time saved to a vessel from the time allowed for loading by the charter.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. § 49.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date & Rep'r Indexes

**5. SHIPPING (§ 49\*)—CONSTRUCTION OF CHARTER—"MUTUAL."—"MUTUALLY"—
"MUTUALLY EXCEPTED."**

The words "mutual" and "mutually," as applied to an exception in the
charter of a vessel, providing for allowances for demurrage and dis-
patch money, that delay from causes beyond control of the parties shall
be "always mutually excepted," cannot be construed in the sense of re-
ciprocal in respect to the same broken engagement, but should be un-
derstood as meaning that the exception was intended to protect the par-
ties from liability to each other, whenever performance of any covenant
was prevented or delayed by any exception.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202;
Dec. Dig. § 49.\*

For other definitions, see Words and Phrases, vol. 5, pp. 4646, 4651.]

Appeal from the District Court of the United States for the East-
ern District of Pennsylvania; J. B. McPherson, Judge.

Suit in admiralty for charter hire by the Pool Shipping Company,
Limited, owner of the steamship Teespool, against Frank Samuel
and Silas M. Tomlinson, copartners trading as Frank Samuel. De-
cree for respondents (192 Fed. 57), and libelant appeals. Reversed.

Charles R. Hickox and Convers & Kirlin, all of New York City,
and Edward F. Pugh, of Philadelphia, Pa., for appellant.

Lewis Lawrence Smith, of Philadelphia, Pa., for appellees.

Before GRAY, Circuit Judge, and BRADFORD and WITMER,
District Judges.

GRAY, Circuit Judge. This is an appeal by the libelant, owner of
the steamship Teespool, from a final decree in admiralty entered No-
vember 22, 1911, dismissing the libel that had been filed against the
charterers, to recover the sum of $476.94, claimed to have been im-
properly deducted by the respondents from the freight, due from
them to the libelant, and of $49, the cost of shifting the steamer from
the berth to which she had first proceeded under the charterers' or-
ders.

The case was tried on the pleadings. Therefore, the allegations of
the libel that are not controverted by the answer are to be taken as
true, and the same as to any allegations of fact set up in the answer.
The material facts, as recited by the libelant and not controverted,
are these:

The owners of the vessel had chartered her on the printed form of
charter of the respondents, to carry a cargo of ore from Carthagena
to Philadelphia, and "there deliver the same as customary always
afloat, when, where and as directed by the charterer or consignee."
The provisions as to time allowed for the loading and discharging
of the cargo and possible dispatch, and demurrage, were:

"The cargo to be loaded at the rate of 250 tons, and discharged at the rate
of 250 tons, per weather working day of 24 consecutive hours (Sundays and
holidays excepted) and charterer or shipper to have the liberty to load and
discharge on Sundays or holidays such time used not to count as lay days.

"The cargo to be received and delivered as customary at ports of loading

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and discharge. Charterer has the option of averaging days for loading and discharging, in order to avoid demurrage, and ship is to load, and discharge as rapidly as possible (if required), by night as well as by day, when required to do so by charterer, shipper or consignee.

"Lay days not to commence to count until 12 o'clock noon after the steamer is entered at the custom house, and in every respect ready to load or discharge, and in free pratique of which the captain is to give notice in writing to shippers and/$_{or}$ consignees. Dispatch money at the rate of fifteen pounds sterling, per day of 24 hours for any time saved in loading and/$_{or}$ discharging, payable by the ship to shipper at loading port, charterer at discharging port, as charterer may elect. But no dispatch money to be charged for forward Sundays and holidays saved.

"Demurrage over and above the said lay days at the rate of thirty pounds sterling per day of 24 hours, except in case of any unavoidable accidents which may hinder the loading or discharging.

"(The act of God, the king's enemies, restraints of rulers and princes, insurrections, epidemics, fire, strikes, frosts, earthquakes, floods, stoppages of trains, miners and workmen, accidents to railways, and to mines from which the ore is to be shipped, bad weather, quarantine, and all and every other dangers and accidents of the seas, rivers and navigation of whatever nature or kind soever, and all unavoidable accidents and all causes beyond the control of the shipper, consignee or the charterer which may prevent or delay the loading or discharging during the said voyage always mutually excepted.)"

Under this charter, the vessel loaded 6,550 tons of ore and proceeded to Philadelphia, where the cargo was all delivered to the order of the respondents; and the freight thereon, as agreed in the charter party, under a proper construction thereof, was earned by the vessel.

On January 10, 1910, prior to the arrival of the Teespool at Philadelphia, the respondents had notified the libelant's agents to have the steamer proceed to the piers at Port Richmond, of the Philadelphia & Reading Railway Company, and there discharge her cargo. The railway company assigned the north side of Pier 14 for this purpose. The Teespool arrived at Philadelphia about noon on January 11th, and in the afternoon of the same day, under instructions from the respondents, the steamer was put in the designated berth at Pier 14, Port Richmond. The respondents also instructed the libelant's agents not to permit the steamer to be taken from the berth until her discharge was completed. 'No cars were supplied to the steamer to receive her cargo on January 12th, 13th and 14th, and on the afternoon of the 14th the commissioners of navigation instructed the master to move the steamer from the north side of Pier 14 to the north side of Pier 13, and that was done. The vessel remained at that pier thereafter until the discharge of her cargo was completed. The discharge was commenced at 1:30 p. m. on January 19th, and completed at 3:30 p. m. on January 22d.

The libel asserts that at all times after the arrival of the Teespool at Philadelphia, and from January 11 to January 22, 1910, inclusive, suitable berths were available where the discharge of cargo from the ship could have been begun immediately and continued without interruption until the discharge was completed, but that respondents refused to order the vessel to any of said berths and insisted that the vessel should remain at the berth to which she had been originally ordered. This last stated averment of the libel is denied in the answer, which avers that after the steamer was put in her berth, re-

spondents learned that the Philadelphia & Reading Railroad Company, which operates a railroad directly to the plant of Worth Bros., at Coatesville, did, in violation of its duty as a common carrier, refuse to furnish either to respondents or to Worth Bros. cars for the discharge of said steamer, on the ground that the cargo was consigned to Worth Bros., at Coatesville. That the cargo had been sold by respondents prior to the arrival of the steamer, and said railroad company had been, prior thereto, apprised of the destination of said cargo to Worth Bros. That as soon as possible after learning of the refusal of the railroad company, the respondents caused a bill in equity to be filed in the state court, at Philadelphia, praying that it, the said Railroad Company, be enjoined from refusing to furnish the necessary cars for the discharge of the steamer. The court, however, at a preliminary hearing on January 18th, declined to issue such injunction. That pursuant to their importunity, respondents aver that the railroad company did furnish the cars on January 19th, and the discharge was begun on that date and proceeded with due promptness to its completion on January 22d. Respondents aver that they did all that was in their power to facilitate the discharge of the steamer, and that the delay in so doing was wholly beyond their control, within the meaning of the charter party.

It is apparent that, under the charter provision that the cargo should be discharged at the rate of 250 tons per weather working day of 24 consecutive hours (Sundays and holidays excepted), 26 days and 5 hours were allowed to the discharge. This is admitted by the respondents.

As the actual work of unloading was commenced at 1:30 p. m. on January 19th, and completed at 3:30 p. m. on January 22d, and therefore occupied 3 days and 2 hours, the respondents claim to be entitled to dispatch money for the difference between 3 days and 2 hours and 26 days and 5 hours. This, of course, takes no account of the 6 days and 1½ hours from noon of January 12th to 1:30 p. m. of January 19th, during which time the ship, owing to circumstances for which admittedly she was in no way responsible, lay idle at the pier. That period of detention, it is claimed by the respondents, must be considered as saved to the shipowner, so as in effect to require him to pay to the charterer £15 a day for that period. We cannot but think there is an unfairness on the face of this proposition which should not be imposed on the shipowner, unless it is clearly required, by a just interpretation of the contract subsisting between the parties.

The provision of the charter party above quoted, viz., "The cargo to be loaded at the rate of 250 tons and discharged at the rate of 250 tons per weather working day of 24 consecutive hours (Sundays and holidays excepted)," it is conceded fixes the number of lay days allowed to the shipper at 26 days and 5 hours. This was the period of time given by the contract to the respondents for discharging the ship; and they might occupy the whole or any portion of that time at their pleasure or convenience, without incurring liability for demurrage to the ship. The sooner the ship could be discharged, the sooner she could return to her business of earning freight, and do away with

the dead charges incurred while lying at the pier. If, therefcie, the unloading could be accomplished considerably within the limit of the lay days, a substantial advantage accrued to the ship by thus releasing her for another charter and voyage. How real and substantial the advantage of being thus released before the expiration of the lay days, and how serious detention after the expiration of such lay days would be to the owners of the ship, is evidenced by two provisions of the charter party, which we again quote:

"Dispatch money at the rate of fifteen pounds sterling, per day of 24 hours for any time saved in loading and/or discharging, payable by the ship to shipper at loading port, charterer at discharging port, as charterer may elect. But no dispatch money to be charged for forward Sundays, and holidays saved.

"Demurrage over and above the said lay days at the rate of thirty pounds sterling per day of 24 hours, except in case of any unavoidable accidents which may hinder the loading or discharging."

[1, 4] The obvious reason moving the shipowner to make this stipulation for the payment of so considerable a sum for dispatch, as well as the terms of the provision itself, seems to us to make it clear that the dispatch contracted for, as for time saved to this ship, should be computed as comprised between the day and hour when the unloading was completed, and the time when the lay days expired, Sundays and holidays excepted. As it is not denied that the lay days began at 12 o'clock noon on January 12th, and that they expired 26 days and 5 hours thereafter, on February 11th, at 5 p. m., any time saved to the vessel under this stipulation must therefore be computed from the day on which the unloading was completed (January 22d, at 3:30 p. m.), up to the last mentioned date. Until the vessel was discharged, there could have been no saving of time to the ship out of the stipulated lay days, and the dispatch earned by the respondents was accordingly for the days intervening between the date of the discharge and the expiration of the lay days, to wit, February 11th, at 5 p. m. The meaning of the words "time saved," in respect to the earning of dispatch money, is clearly and well stated by the Circuit Court of Appeals for the Second Circuit, in Red R. Steamship Co. v. North American Transport Co., 91 Fed. 168, 33 C. C. A. 432. Shipman, Circuit Judge, delivering the opinion in that case, says:

"We are of opinion that the 'time saved in loading' means the amount of time saved to the vessel from the time allowed for loading by the charter, and that, as loading was completed on September 2d, at 4:30 p. m., the dispatch days then commenced, and ran to September 11th, at 7 o'clock a. m., being 8 days and 14 hours, in accordance with the dispatch statement. The charter specifies how many days are allowed for loading, and then provides that dispatch money is to be allowed to the charterers for each day and part of a day saved in loading. This means that, if the charterers can turn the vessel over to the master for the purpose of the voyage before the time permitted to them for loading, there shall be an allowance for each day and part of a day thus saved to the owners."

[2] In the case at bar, the vessel was turned over to the master 17 days, and not 23 days, before the expiration of the lay days, and 17 days, and not 23 days, were "saved to the ship."

The second clause above quoted, by which a "demurrage over and

above the said lay days at the rate of thirty pounds sterling per day of 24 hours, except in case of unavoidable accidents which may hinder the loading or discharging," is consistent with and emphasizes the meaning we give to the stipulation for dispatch. This clause, it will be observed, while it mulcts the respondents for demurrage, also protects them from its imposition where the delay has been occasioned by unavoidable accidents.

It is not necessary that we should now consider whether, in case demurrage had been claimed by the libelant, the respondents could have been relieved therefrom on the ground that the railroad company, if its delay had continued so long, had prevented the discharge of the ship within the lay days, and that what occurred between the respondents and the railroad company was an unavoidable accident. If, however, it were conceded that, in the case supposed, the respondents would not be obliged to pay libelant demurrage, it does not follow that they can require the shipowner to pay them for the time during which the ship was tied up, to accommodate either the exigency or convenience of the charterer's business. This would be to impose a double burden on the ship, by not only depriving it of demurrage, if the delay continued so long, but by compelling it also to pay for a dispatch it had not received. No such privilege is conferred by the dispatch stipulation or the general "exception" clause, hereinafter referred to, upon the charterers.

It now remains to examine the position, taken by the respondents, that they only learned after the ship had been placed in her berth that the Philadelphia & Reading Railroad Company refused, on the ground of a business difference with Worth Bros., to furnish cars to receive the steamer's cargo, and that their delay in commencing to unload for 6 days 1½ hours was caused by this refusal on the part of the railroad company. They contend, and the court below supports the contention, that this cause of delay was beyond the respondents' control, and though it was much more beyond libelant's control and was a matter to which libelant bore no relation whatever, yet libelant must bear the whole burden thereof and pay to the respondents, in the shape of dispatch money, a penalty for such delay. For this contention, we are referred to the clause in the charter party above quoted and immediately following the stipulation for demurrage to which we have referred. The language relied on is as follows:

"The act of God * * * unavoidable accidents, and all' causes beyond the control of the shipper, the consignee or the charterer, which may prevent or delay the loading or discharging during the said voyage always mutually excepted."

It is this language upon which the court below seems to rely, in order to qualify the plain meaning of the preceding clauses. It is apparent, however, that this language—though made somewhat obscure by the use of the word "mutually"—was intended to relieve either party to the contract from any duty or liability imposed upon it by reason of delay in "loading or discharging during the voyage," occasioned by causes beyond the control of such party. Undoubtedly a liability for demurrage on the part of the respondents for delay so

occasioned, would come within the exception of this clause. So, "bad weather, quarantine, and all and every other dangers and accidents of the seas," as enumerated in the said clause, would undoubtedly relieve the libelant from liability from delay occasioned thereby. In such cases, the application of this clause is direct and palpable, but should not be so extended as indirectly to destroy the clear meaning of the dispatch money stipulation.

In the case before us, it is not invoked to relieve the respondents from any forfeiture, penalty, or liability under the contract. It may have been the misfortune and not the fault of the respondents, that this delay of 6 days and upwards prevented them from earning as much dispatch money as they otherwise would have earned, but it was clearly not the fault of the libelant. The misunderstanding between the respondents and the railroad company was a matter with which libelant had nothing whatever to do and to which it bore no possible relation. On the other hand, if it were necessary so to do, there is good ground for holding that the respondents were not measurably relieved from their contractual obligation to give the libelant good dispatch, by the fact that they had consigned the cargo in such fashion as to have created the delay.

In Sleeper et al. v. Puig et al., 17 Blatchf. 36, Fed. Cas. No. 12,-941, the vessel was chartered to the respondents for a voyage from New York to Santa Cruz and thence to Havana. The respondents were allowed for the loading and discharging of the vessel, "dispatch for loading at New York and discharging at Havana; 30 running days for discharging and loading at Santa Cruz;" and in case the vessel should be longer detained by respondents or their agents, demurrage was to be paid the vessel's agent at the rate of $35 per day. The libel alleges that the vessel took on cargo at Santa Cruz and arrived at Havana; that her master duly reported his readiness to discharge cargo on the 4th of April; that the agents of the respondents did not give the vessel dispatch in discharging, but neglected to discharge the cargo for 17 days from the necessary lay days under the terms of the charter party. To this it was answered by the respondents that when the vessel arrived at Havana, the consignees of the respondents, as soon as they were notified of arrival, immediately proceeded to assist her master in procuring a wharf and in unloading the vessel. There was, however, no berth unoccupied at the wharf, nor was it possible to procure one; that by the laws and usages prevailing in the harbor at Havana, the control of wharves and berths, as well as the number of hours per day allowed for the discharge and loading of cargo is not with the merchants or other private individuals, but with the government officials, who dispose of said matters as they deem proper; that as soon as it was possible, the said officials provided a proper and suitable berth for the vessel, and that the master was allowed the full and usual number of hours per day to effect said discharge. Judge Blatchford, in affirming the decree of the court below, said:

"The vessel, from the 4th of April, was at her anchorage ready to deliver her cargo. She did not get aground, or in any manner become disabled or

prevented from going to the mole or from delivering her cargo, except by the fact that there was no room for her at the mole. Under these circumstances, and in view of the terms of this charter party, the risk was on the respondents, and not on the vessel, of any delay in obtaining a place of discharge at the mole."

It is true, as we have already said, that we are not concerned here with a claim for demurrage against the respondents, but the view taken by this distinguished admiralty judge, of the responsibility resting on the respondents, would apply with great force in the present case, if, as the court below erroneously supposes, it turned on the question, whether the cause of delay was beyond the respondents' control.

To the same effect is the recent case of The Edward T. Stotesbury, 187 Fed. 111, 109 C. C. A. 31.

[5] We think the court below erred in giving a meaning and application to the word "mutual" in the excepting clause, not warranted by any proper construction of the contract. Our views in regard to the significance of this word in this connection are supported by the well-considered decision of the Court of Appeals for the Second Circuit, in Clyde Commercial S. S. Co. v. West India S. S. Co., 169 Fed. 275, 94 C. C. A. 551. In that case, the charter party contained a clause very much the same as the one relied upon by the respondents in the present case, relieving either party to the contract from liability to the other, occasioned by certain happenings beyond its control, by saying that they were "mutually excepted." As to the significance of the word "mutual" or "mutually," the court say:

"The parties, however, did provide a series of exceptions in article 17, which are described as 'mutual.' We think this word cannot be construed in the sense of reciprocal in respect to the same broken engagement, because the charter party contains no such reciprocal or interdependent covenants. * * * By mutual, we understand that the parties intended the exceptions to protect each from liability to the other whenever performance of any covenant was prevented or delayed by any exception."

[3] In conclusion, we are of opinion that as the lay days began on January 12th, at noon, and the discharge was completed on January 22d, at 3:30 p. m., the time saved to the ship for which dispatch money was due, was the time elapsing between that day and hour and February 11th, at 5 p. m.; i. e., 17 days 1½ hours, excluding Sundays and holidays. This includes Saturday afternoon, which, though claimed by respondents as a half holiday, is not so recognized by the laws of Pennsylvania. We think the judge was right in disallowing the claim for the expense of removing the ship from its first berth to another. This removal was made by order of the state officials, and for that reason is not a proper subject for a claim against the respondents.

Let the decree below be reversed and a new decree entered in conformity with this opinion.