## THE CORVUS.

### Intervening Petition of DIREZIONE GENERALE COMBUSTIBILI.

(District Court, D. Maryland. June 22, 1922.)

No. 889.

1. Shipping ☞49(6, 7), 174—Consignee liable for demurrage, and may collect dispatch money in proceeding in rem.

A consignee is liable for demurrage, and its right to collect dispatch money is reciprocal, and may be enforced in a proceeding in rem.

2. Shipping ☞49(6)—Consignee held entitled to dispatch money.

Under a charter party providing that cargo should be taken from alongside by consignee "as quickly as steamer can deliver, but in no case at less than 800 tons per working day," and for "demurrage at the rate of $.48 (.16 dispatch) per gross registered ton of steamer," the provisions for demurrage and dispatch *held* reciprocal, and the consignee entitled to recover dispatch money for time saved by receiving cargo at a faster rate than 800 tons per working day.

In Admiralty. Intervening petition of the Direzione Generale Combustibili against the steamship Corvus. Decree for intervener.

Lee S. Meyer, of Baltimore, Md., for intervening libelant.

Bigham, Englar & Jones, of New York City, and Janney, Stuart & Ober, of Baltimore, Md., for claimant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROSE, District Judge. The petitioner, the Direzione Generale Combustibili, is an Italian corporation, and was the consignee (by which title it will be hereinafter referred to) of a cargo of coal shipped by the steamship Corvus from Norfolk to Genoa. It seeks to recover certain dispatch money to which it says the charter of the ship entitled it. The relevant provisions of the charter party are in its fourth, fifth, sixth, and eighth paragraphs. Among other things, the fourth says:

"Cargo to be loaded into steamer with customary dispatch in accordance with the rules of the port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted, unless used."

The fifth reads:

"Lay days for discharging shall be as follows: Commencing from twenty-four hours after arrival at or off discharging port, whether steamer is in berth or not; cargo to be taken from alongside by the consignee named in the bill of lading at port of discharge as quickly as steamer can deliver, but in no case at less than 800 tons (2,240 pounds each) per working day, Sundays and legal holidays excepted, unless used."

The sixth provides:

"Also that, for each and every day said steamer is on demurrage at either loading or discharging port, the party of the second part, or agent, shall pay to the party of the first part, day by day, demurrage at the rate of $.48 (.16 dispatch) per gross registered ton of steamer per running day, or pro rata for part of a day."

The eighth is the usual cessor clause, reserving to the ship—

"a lien upon the cargo for all freight, dead freight, and demurrage, and all and every other sum or sums of money which may become due the steamer under this contract of affreightment."

Lay days for discharging began at 5:23 a. m. on Friday, December 10, and at 800 tons discharged per day would have ended, allowing for Sundays, on Tuesday, December 21, at 5:32 a. m. Unloading was completed in point of fact at 2:45 p. m. on Friday, December 17, a saving of 3 days, 9 hours, and 43 minutes, from which the ship may not deduct Sunday, December 19. Red "R" S. S. Co., Ltd., v. North American Transport Co., 91 Fed. 168, 33 C. C. A. 432. At the rate of 16 cents per gross registered ton for every 24 hours, the amount of dispatch money due, if any, is $3,325.06.

[1] Upon the objection of the ship, the previous libel, filed by the American charterer, the Universal Transportation Company, to recover this dispatch money, was dismissed, because, as the charterer by the cessor clause had exempted itself from liability for delay, it could not claim credit for promptness. Then the consignee filed this petition. The ship contends that it has no standing so to do. The consignee is liable for demurrage (Yone Suzuki v. Central Argentine R. Co. [D. C.] 275 Fed. 54), and its right to collect dispatch money is reciprocal, and may be enforced in a proceeding in rem (The Muirfield [D. C.] 174 Fed. 75).

[2] A more serious contention of the claimant is that the charter party did not impose on any one any obligation to pay dispatch money for unloading. It calls attention to the fact that, while the charter says "cargo is to be loaded with customary dispatch" at a minimum of fifteen

hundred tons per running day, it is to be dispatched as quickly as the steamer can deliver, but in no case at less than 800 tons per working day; and it argues that the difference between these two phrases shows that the parties did not intend to bind the steamer to load with more than customary dispatch, but that they did require it to undertake to discharge as quickly as it could deliver. For any excess over customary dispatch it might be entitled to compensation, but, as it was bound in any event to deliver as quickly as it could, for so doing it would be entitled to no reward. The argument is ingenious, but scarcely persuasive. In the language of Lord Justice Mathew, quoted by Lord MacNaghten, it "savours of subtility equally foreign to the way in which clauses in charter parties have been put together and built up, and the manner in which the mercantile instruments are understood by business men." Hulthen v. Stewart & Co. [1903] A. C. 393. It resembles not a little the view of some theologians that good works profit a man nothing. He is bound to keep all the moral laws, and he can get no credit for doing what is merely his duty.

The ship relies on Dobell v. Watts, Ward & Co., 7 T. L. R. 622, in which the charter provided:

"That the cargo was to be received from alongside ship at port of discharge as customary, as fast as steamer can deliver her in ordinary working hours, not less than 100 standards per day."

When the ship arrived, a stevedore strike made it impossible for the consignee to take the cargo from the ship at anything like the rate of 100 standards a day. The ship claimed demurrage, to be calculated upon the assumption that the consignees were bound to do so. It was held, however, that this clause in the particular charter was for the protection of the consignee, the interests of the ship having been amply protected by other clauses, and all that the consignee had undertaken to do was to use all due and reasonable diligence.

In the instant case, paragraph 6 of the charter party, above quoted, seems to make it perfectly clear that the parties intended that dispatch was, both in loading and discharging, to be reciprocal with demurrage. Such being the agreement of the parties, there is no reason why it should not be given effect.

A decree in conformity with the conclusions herein stated may be submitted.