---

## THE SIF.

(Circuit Court of Appeals, Second Circuit. May 7, 1923.)

No. 216.

1. **Principal and agent** ⬅106—**Charterers held bound by action of agent at port of discharge as to payment of dispatch money.**

   By the terms of a charter party the vessel was consigned to charterers' agent at port of discharge, who was to pay costs of discharge and all port charges. The charter was made through brokers, and owner and charterers had no communication with each other, but in accordance with usage owner dealt with charterers' agent as to all matters arising at the discharging port. *Held*, that payment by the owner of dispatch money earned at that port to the French government, which claimed it as consignee of the cargo, by direction of charterers' agent, was binding on charterers, in the absence of instructions to their agent to the contrary.

2. **Principal and agent** ⬅137(1)—**Charterers held estopped by laches to deny authority of agent.**

   Where charterers were advised by their agent at the French port of discharge that the French government, as consignee, claimed dispatch money earned in discharging, but failed to instruct the agent for a month thereafter, when the agent directed the owner to pay the dispatch money to the French government, charterers were chargeable with laches, which estopped them to deny the agent's implied authority to give such direction.

3. **Principal and agent** ⬅106—**Authority of agent to pay money presumed, when within general scope of agency; payment by agent binds principal.**

   An agent's authority to make or direct payment of moneys received will be presumed, whenever such power is reasonably necessary to ef-

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

fectuate the main object of the agency, and such payment within the scope of his implied authority is the act of, and binding on, the principal.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Warner Moore and Thomas L. Moore, copartners doing business as the Dunlop Mills, Warner Moore & Co., Proprietors, against the steamship Sif; the Aktieselskabet Jacob R. Olsen, claimant. Decree for libelants, and claimant appeals. Modified.

Haight, Sandford & Smith, of New York City (Herbert K. Stockton, of New York City, of counsel), for appellant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter and Alvah H. Combs, both of New York City, of counsel), for appellees.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. [1] This libel was filed in rem, and process, with a clause of foreign attachment, was issued against the Norwegian vessel Sif. The claim is for dispatch money earned by the appellees, who were the charterers of the Sif. The amount of the dispatch money is not disputed. It was paid by the appellees to the French government. The Sif is a tramp steamer, and was owned by a Norwegian corporation of Bergen, Norway. The charterers shipped a cargo of flour from Newport News, Va., to Nantes, France, on a sale to the French government dated January 22, 1916. A firm of ship brokers in New York City, correspondents of a ship broker in Bergen, negotiated the charter. The New York firm collected and remitted to the owner in Norway the charter freight, and the same firm afterwards suggested the name of the agent at Nantes to whom the charterer might consign the vessel, as required in a clause of the charter party, and acted as an intermediary in passing negotiations between the charterers and this agent. The agent selected at Nantes was a ship agent and broker, his appointment was affirmed by the charterers, and on instructions from the owner payment of the dispatch money earned under the charter was made to him. The cargo was consigned to La Commission Internationale de Ravitaillment at London, which was an agency of the French government.

By the terms of the charter party, the voyage contemplated was made from Newport News "to a safe port on the Atlantic coast of France, between Bordeaux and Brest," both inclusive, at the charterers' option. It was provided that the charterers' agent pay the cost of discharging the cargo and all port charges incidental to the cargo at the discharging port to which the steamer would be ordered, and provided an agent of the custom house business free of commission. It provided that the steamer be consigned to the charterers' agent at the ports of loading and discharging, and their broker to attend to the ship's business free of commission. It further provided that, "if sooner dispatched, steamer to pay £175 for each day saved." There were saved at the port of discharge 7 days 23 hours, resulting in dispatch money of £1,392.14.2. Of this £1,090.2.1 was due to the charter-

ers. It is admitted that the agent at Nantes was appointed by the charterers, and was authorized by them to perform at this port all those obligations which the charter party imposed upon them at that port. After the ship had discharged at Nantes, the owner received in due course a letter from the agent, informing him that the dispatch money is payable to the French Commission at London and upon receipt of that letter the owner instructed a London firm to pay the dispatch money to the commission and informed the agent at Nantes by letter that this had been done.

This suit is to compel the owner to pay £1,090.2.1 over again, the claim being that the owner owes this to the charterer. By the tenth clause of the charter the charterers' agent was to pay the cost of discharging cargo, pilotage, and all port charges incidental to their cargo at the discharging port, and by the twelfth clause the steamer was consigned to the charterers' agent at ports of loading and discharging. There is evidence of a custom that, in the absence of any specific instructions from the charterers, the master or owner deals with the charterers' agent at the discharging port in connection with all matters that might arise. The questions presented are whether the agent at Nantes, having authority to receive payment, could bind his principals, the charterers, in paying out the moneys so received, and whether or not he had implied authority to make payments of the moneys so received. When this shipment was made in 1916, it was during the war period, when there was much activity in maritime affairs, and solvent governments were purchasing through boards, commissions, and other established agencies. The flour was sold to the French government and consigned to the orders of the charterers, with instructions to notify the French government at Nantes, France. The dispatch was claimed by the French Commission, acting under instructions from the French War Office. The Norwegian owner of the vessel had no communication with the charterers, nor did the charterers communicate with the owner directly. All the negotiations ceased when the charter was closed and the charter party freight was collected and remitted to the owner in Norway. From that point on, the master and owner dealt entirely with the agent appointed at Nantes for instructions as to all matters connected with the charter party at Nantes. The ship had been consigned to this agent at Nantes as the charterers' agent for all the purposes of the charter party. The owner could not and did not learn what arrangement the charterers had made in connection with the sale of the flour. The dispatch may as readily have been made payable to the consignee as to the charterers.

It appears to have been a practice at times to pay dispatch money to the consignee. This was usually determined by instructions from the charterer, and, if no instructions as to payments were given, the dispatch money was usually paid to the charterers or their agent at the discharging port. The consignee's liability for demurrage and authority to collect dispatch money are reciprocal, and the claim for dispatch may be enforced by the consignee by a suit in rem. The Corvus (D. C.) 282 Fed. 939. Indeed, in this regard the testimony of the charterers is that the French government had no claim under the contract, because

it was paying demurrage. We do not think it was incumbent upon the owner to seek this knowledge personally from the charterers and pay only on their instructions. Since no instructions were given by the charterers, payment thereof to the charterers' agent at discharging port is sufficient. If that agent gives instructions to the owner to pay to a third party, we think that is binding upon the charterers and comes within his implied authority to act. This owner was necessarily, under the circumstances, dependent upon his information from the agent at Nantes as to whom to make payment. He did not depend upon the consignee's instructions, but looked to the charterers' agent for this information.

It further appears that the charterers were advised that the consignee made claim to the dispatch moneys. It must be borne in mind, that the brokerage firm, which represented the owner in making the charter at the request and on behalf of the charterers, suggested the name of the agent who was selected at Nantes. When the vessel finished discharging on June 18, 1916, this agent wired that the consignees were asking £100 per day dispatch money. The appellees answered that this was unreasonable, and on June 27th the French government was demanding dispatch money in a larger sum. Then the New York brokerage firm wrote the appellee:

"We must admit that we are at a loss to understand why the French Commission are requesting dispatch money, unless, of course, you have some arrangement with them of which we are not cognizant."

On January 27th the charterers replied that they did not understand, but were "waiting to receive full particulars prior to settlement either way." Undoubtedly the claim of the commission was made in good faith. Again on July 19th the New York brokerage firm suggested by letter that they deemed it advisable for the appellees to straighten out the matter as to who was entitled to dispatch money with the French War Office in London, and on July 21st the appellees replied that they had cabled their agents in Paris and hoped to have the matter settled without trouble. But during all this period no instructions were given to the agent at the discharging port as to what position he should take in the matter of the French government's claim, nor did the New York brokerage firm communicate with this agent or the owner. However, on July 17th, the charterers' agent at Nantes wrote instructing the owner to pay the French government in London. It was only on August 24th, after the charterer had learned the money was paid to the French government, that they proclaimed that they did not recognize the agent at Nantes or the French Commission.

[2] These facts demonstrate that the appellees were guilty of laches. They were chargeable with the knowledge that it was common to pay dispatch money to the consignee. They knew that the consignee, a sovereign power, was demanding dispatch money, whether rightly or wrongly, and they failed to communicate with their agent at Nantes, leaving him without information or instruction for his guidance. They are, by this conduct, estopped from denying implied authority of the agent to instruct that payment be made to the French government as he did.

[3] The limitations of implied authority are necessarily dependent upon the position of the agent and the circumstances surrounding each particular case. The agent's authority to make or direct payment of moneys received will be presumed whenever such power is reasonably necessary to effectuate the main object of the agency. It is the general and accepted rule that an agent, while acting within the scope of his expressed or implied authority and in reference to the matter over which his authority extends, is the act of the principal. The principal is bound by the knowledge of his agent. We think the agent had the authority exercised. There is admittedly due the charterer £302.12.1, which, under the stipulation entered into below, amounts to $1,361.72, which sum will be paid to the charterer.

The decree is modified accordingly.