### SOUTH AMERICAN METAL CO. v. KJOGE et al.

### THE THEODORE ROOSEVELT.

(Circuit Court of Appeals, Fourth Circuit. April 16, 1926.)

No. 2451.

1. Shipping ⟨key⟩181—Under charter party providing for 72-hour period before lay days began to run, Saturday afternoon, Sunday, and Armistice Day will not be added to 72-hour period in determining dispatch money; Sundays and legal holidays not being excepted from 72-hour clause.

Under charter party providing that lay days for loading should commence 72 hours after steamer was ready to load, Saturday afternoon, Sunday, and Armistice Day, will not be added to 72-hour period in computing dispatch money, although Sundays and legal holidays were excepted in loading clause, where there was no exception in 72-hour clause.

2. Shipping ⟨key⟩181—Under charter party providing for 72-hour period before lay days begin to run, and excepting Sundays and legal holidays from loading period, lay days commence at midnight when 72 hours expired on Sunday.

Under charter party providing for 72-hour period before lay days began to run, and excepting Sundays and legal holidays from loading clause, lay days would not commence to run until Sunday midnight, where 72-hour period expired at 9 a. m. on Sunday.

3. Shipping ⟨key⟩181.

Dispatch money is payable for Sundays and holidays intervening during lay days, including Saturday afternoon, made a legal holiday by Code, Va. 1919, § 5758, under contract providing for dispatch money for all time saved to ship.

4. Shipping ⟨key⟩181—Lay days for unloading cargo on ship arriving at night do not commence to run until 7 o'clock on morning following, at port legally closed until 7 a. m.

Where, under port customs, vessels are not considered as having arrived until 7 a. m., since port is legally closed until then, lay days for discharging cargo do not commence to run until 7 o'clock on morning following, when ship arrives at night.

5. Shipping ⟨key⟩181—Charter party providing for free time at discharging port held to give free time at each unloading port.

Under charter party providing that lay days for discharging should commence 24 hours after arrival at discharging port, charterer was entitled to 24 hours' free time before commencement of the lay days at each unloading port.

6. Shipping ⟨key⟩181—Nonworking day declared by master of port should be excepted from running of lay days, in determining dispatch money to charterer, where steamer under charter party had duty to put coal over side of ship.

Where ship under charter party had duty of discharging cargo at certain rate, and was unable to perform such duty because master of port declared nonworking day, such day should be excepted from running of lay days in determining dispatch money due to charterer.

7. Shipping ⟨key⟩175.

Under charter party requiring charterer to receive cargo from vessel at certain rate per day, loss of time at one port should be offset against saving at another.

8. Shipping ⟨key⟩183.

Master of ship has authority to bind owner in making settlement of dispatch money due charterer, when made substantially in accordance with legal rights of parties.

9. Shipping ⟨key⟩183—Charterer and owner held to have ratified settlement between charterer's agents and master of ship as to demurrage and dispatch money.

Where charterer's agents and master of ship arrived at settlement as to questions of dispatch money and demurrage at different

ports, *held* that owner ratified settlement by pleading it as defense, and charterer by retaining payment thereunder and not questioning it for more than a year, and neither charterer nor owner were entitled to recover anything further on account thereof.

**10. Shipping ⊜⟹50.**

Owner of vessel *held* properly allowed claim for board of tallymen and checkers on board vessel at instance of charterer when cargo was being discharged.

**11. Shipping ⊜⟹50.**

Owner of vessel is not liable for wages of tallymen and checkers, employed by charterer during unloading of cargo, in absence of obligation therefor in charter.

**12. Shipping ⊜⟹50—Although custom of port requiring delivery of coal in sacks imposed duty of making delivery in such manner, it did not impose duty of furnishing sacks free of cost to charterer.**

Although custom of port requiring delivery of coal in sacks imposed on vessel duty of making delivery in such manner, it did not impose duty of furnishing sacks free of cost to charterer, in absence of stipulation to such effect in charter.

Appeal and Cross-Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel by the South American Metal Company, charterer of the motor vessel Theodore Roosevelt, against Henry Kjoge, master of the motor vessel Theodore Roosevelt, and Fred Olsen & Co. From the decree, libelant appeals, and respondent last named cross-appeals. Decree modified.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

Homer L. Loomis, of New York City (Loomis & Ruebush, of New York City, and Baird, White & Lanning, of Norfolk, Va., on the brief), for appellant.

Clarence B. Smith, of New York City (Hughes, Little & Seawell, of Norfolk, Va., and Haight, Smith, Griffin & Deming and Frank A. Paul, all of New York City, on the brief), for appellees.

PARKER, Circuit Judge. This is an appeal in admiralty by the South American Metal Company, charterer of the motor vessel Theodore Roosevelt, and cross-appeal by the master and owner of the vessel. The vessel was chartered to transport a cargo of 9,500 tons of coal, more or less, from Norfolk, Va., to two ports on the coast of Chile, Iquique and Antofagasta. Libel was filed by the charterer claiming dispatch money alleged to have been earned at Iquique

and Antofagasta, amounting to $5,499.88 in excess of the amount paid on that account by the owner, and for the sum of $990.18, alleged to have been advanced by the charterer for account of the owner at these ports. The owner answered, denying liability for the dispatch money claimed or for the alleged advancements, except $34.50 agency fee at Iquique, pleaded a settlement of the claim for dispatch money, and filed a cross-libel claiming demurrage in the sum of $10,709.57, alleged to have been incurred by the charterer at Antofagasta, advancements on account of the charterer in furnishing meals to laborers, tallymen, and checkers at Iquique in the sum of $270, and an overdeduction of dispatch money amounting to $2,905.20 from freight paid at Norfolk. The allegations of the cross-libel were denied by the charterer. The District Judge entered a decree awarding the owner $1,192.54 for dispatch money improperly deducted from freight at Norfolk, and $3,878.22 for demurrage incurred by the, charterer at Antofagasta, together with $34.47 for meals furnished to the tallymen, weighers, and checkers of charterer at Iquique, awarding the charterer the sum of $1,328.04 for dispatch money at Iquique, in addition to the sum of $2,561.75 already paid, and the agency fee of $34.50 paid at Iquique, and decreeing that there was a balance of $3,777.19 due from the charterer to the owner. The appeal and cross-appeal present the following matters for review: (1) The overdeduction of dispatch money at Norfolk; (2) the amount of the dispatch money earned by charterer at Iquique; (3) the dispatch money earned or the demurrage incurred at Antofagasta; (4) the alleged settlement of the claim for dispatch money; (5) the owner's right to recover for meals furnished the tallymen, weighers, and checkers of charterer at Iquique; and (6) the right of charterer to recover for advancements alleged at Iquique and Antofagasta.

The charter party is in the usual form, and the following are the pertinent provisions thereof:

"4. Lay days for loading, if required by the party of the second part, not to commence before November 1, 1920, otherwise lay days to commence from 72 hours after steamer is ready to load, whether in berth or not, and master has given notice in writing of such readiness to the party of the second part or his agent.

"Should the steamer not be ready for cargo at her loading port on or before November 30, 1920, the party of the second part, or his agent, may at his option cancel

this contract of affreightment at any time not later than the day of the steamer's readiness to load. Cargo to be loaded into steamer with customary dispatch, in accordance with the rules of the port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted. Any time lost at docks through riots, strikes, lockouts, disputes between masters and men, or by reason of floods, frost, logs, or storms, or by reason of accidents to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo, that occasions a stoppage of delivery of coal to said steamer, is not to be computed as part of the loading time, unless any cargo be actually loaded during such time.   *   *   *

"5. Lay days for discharging shall be as follows: Commencing from twenty-four (24) hours after arrival at or off discharging port whether steamer is in berth or not, cargo to be taken from alongside by the consignee named in the bill of lading at port of discharge as quickly as steamer can deliver, but in no case at less than 500 tons (of 2,240 pounds each) per running day, Sundays and legal holidays, and surf days, provided steamers can discharge at this rate, excepted, unless used.

"6. Also, that for each and every day said steamer is on demurrage at either loading or discharging port, the party of the second part, or agent, shall pay to the party of the first part, day by day, demurrage at the rate of forty-eight cents per gross registered ton of steamer per running day, or pro rata for part of a day."

"18. At loading port, steamer to be consigned to charterer's agents, paying usual agency fee at each port, and at discharging port, steamer to be consigned to charterers' agency, paying usual agency fee at each port, steamer to allow charterers 16 cents per gross register ton dispatch money for each and every day saved at loading and discharging ports."

With regard to the overdeduction of dispatch money at Norfolk, the facts are as follows: The vessel arrived at Norfolk and reported for loading at 9 o'clock in the morning of Thursday, November 11, 1920. She immediately began to load, and loading was completed at 1 p. m. on Saturday, November 13th. 9,881 tons of coal were loaded, and the lay days allowable under the charter party on this tonnage amounted to 6 days 14 hours and 6 minutes. Dispatch money was computed on the basis of a saving of 9 days 22 hours and 6 minutes on a gross registered tonnage of 7,150 tons or at the rate of $1,-144 per day, amounting to $11,348.44. In the computation of the time allowed for loading under the lay day provisions, Armistice Day and from Saturday, November 13th, at noon, till Sunday, November 14th, midnight, were allowed, in addition to the lay days, and in addition to the 72 hours' free time before the lay days should begin to run.

The contention of the master, however, was that Armistice Day and the day and a half from Saturday noon till Sunday midnight should be included within the time provided for in the 72-hour clause and not added thereto. This controversy was reserved for future settlement, and in the meantime the deduction was allowed. It was admitted that the dispatch money should have been computed upon a gross registered tonnage of 7,116 instead of 7,150 tons, and that this would amount to $1,138.56 for one day's dispatch. The District Judge awarded this item of overcharge amounting to $53.98 to the owner, and held that the charterers were not entitled to credit for Armistice Day, awarding the owner the sum of $1,138.56 for the deduction which had been made on account thereof.

[1] We think that the contention of the owner is correct that Armistice Day, Saturday afternoon, and Sunday should not be added to the 72-hour period which was to elapse before the lay days should begin to run. The charter party expressly provided that the lay days should commence 72 hours after steamer should be ready to load, whether in berth or not, and after the master should have given notice in writing. Sundays and legal holidays were excepted from the terms of the loading clause, but no exception as to them was made in the 72-hour clause; and the reason for their exception from the loading clause did not exist with respect to the 72-hour clause. The occurrence of Sundays and legal holidays would interfere with the loading, but they would not interfere in anything like the same measure in the making of preparations for loading, especially as there would be one or more working days in the 72-hour period prescribed. At all events, the parties stipulated, without specifying any exceptions, that the lay days should commence at the end of the 72-hour period, and the court will carry out their agreement as it is written. W. K. Niver Coal Co. v. Cheronea S. S. Co. (C. C. A. 1st) 142 F. 403, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126; The Lake Yelverton (C. C. A. 4th) 300 F. 47; The Olaf (D. C.) 248 F. 807; Elder Dempster S. S. Co. v. Earn Line S. S. Co. (C. C. A. 2d) 168 F. 50, 93 C. C. A. 472. Furthermore, so far as

Armistice Day is concerned, it was not at that time a legal holiday.

[2, 3] But, although we accept the owner's contention as to the law, we cannot accept its contention as to the application of the law to the facts. The 72-hour period expired at 9 a. m. Sunday, the 14th. The lay days would have commenced then, but for the provision in the loading clause excepting Sundays from the running of the lay days. On account of this, they began to run at midnight of Sunday the 14th. The lay days admittedly were 6 days 14 hours and 6 minutes. This would carry the free time to 6 minutes past 2 o'clock in the morning of Tuesday, November 23d, as the afternoon of Saturday, November 20th, being a legal holiday (Va. Code, § 5758), and Sunday, November 21st, would be excepted. Dispatch money is payable for Sundays and holidays which intervene during the lay days allowed, where (as here) the contract provides that dispatch money shall be paid for all time saved to the ship, and not merely for time saved in loading. Buckley, L. J., in Nelson v. Nelson Line, [1907] 2 K. B. at 725; Carver, Carriage by Sea (5th Ed.) § 633, p. 840. As the loading was completed at 1 p. m. on Saturday the 13th, the time saved to the owner was 9 days 13 hours and 6 minutes, and the dispatch money for this period amounted to $10,875.50. As $11,348.84 was deducted as dispatch money from the freight paid by the charterer, it follows that there was an overdeduction of $473.34, which the owner is entitled to recover.

[4] The vessel arrived off the port of Iquique, at 1 o'clock a. m. Tuesday, November 30th, but was not allowed to enter the port until 7 a. m. It was received by the authorities at 7:30 and was moored. Notice of arrival given by the master at 8. Custom house formalities were complied with and working permit given at 9:30, and work was officially commenced at 10. The provision of the charter was that the lay days should commence to run 24 hours after the arrival of the vessel at or off the discharging port. Under the custom prevailing at the port, vessels are not considered as having arrived until 7 o'clock, as the port is legally closed until then; and, where a ship arrives during the night, time counts from 7 o'clock the following morning. The lay days commenced to run, therefore, at 7 a. m. December 1st. 6,339 tons of coal were discharged, and the time allowed under the charter for unloading this quantity was 12 days 16 hours and 16 minutes. Two Sundays and one legal holiday intervened during the lay days, so that they

expired December 16th at 11:16 p. m. The ship finished discharging at 5 p. m. Monday, December 13th, so that 3 days 6 hours and 16 minutes were saved at that port.

[5, 6] The vessel then proceeded to Antofagasta, arriving off the port at 5 p. m. December 14th. There is some controversy as to whether the 24-hour free time would apply to that port as well as to Iquique; but we agree with the District Judge that the fair interpretation of the charter provision is that the charterer should have 24 hours free time before the commencement of the lay days at each unloading port. The lay days commenced, therefore, at 5 p. m. Wednesday, December 15th. 3.542 tons were discharged, and the lay days for unloading this quantity, estimated upon a delivery of 500 tons per day, were 7 days 20 hours and 9 minutes. One Sunday and one legal holiday intervened, however, and these should be added. There is some controversy about the holiday, December 21st, but it appears that this was declared a "dia inhabil," or nonworking day, by the master of the port, and that no work was done as a result of the declaration, and we think that it should be treated as a legal holiday within the meaning of the charter. Furthermore, it was the duty of the charterer to take delivery of 500 tons per day, "provided the steamer can discharge at this rate"; and, as it had the duty of putting the coal over the side of the ship and was unable to perform this duty as a result of the declaration of the master of the port, it would seem that this day would be properly excepted from the running of the lay days, whether it be considered a legal holiday or not. When this day and the intervening Sunday are excepted from the lay days, the time of unloading would have expired at 9 minutes past 7 o'clock on December 24th. It appears that the unloading was completed at 10 o'clock on the evening of the 25th, so that it extended approximately one day and 3 hours beyond the expiration of the lay days.

[7] As it was the duty of the charterer to receive all of the coal from the vessel at the rate of 500 tons per day, it is manifestly just that a loss of time at one port should be offset against a saving at another; and a computation was made on this basis between the master and the charterer's agents at Antofagasta. When the time lost at Antofagasta is offset against the time saved at Iquique, the time saved at the two ports is seen to be approximately 2 days and 3 hours.

In the unloading at Antofagasta, it appears that on the 22d, 23d, 24th, and 25th of

December, considerably less than 500 tons per day was delivered as a result of inability to discharge from all of the vessel's hatches. Contention was made by the charterer that it was ready and able to receive delivery in greater quantities, but that the vessel was unable to discharge at a greater rate, and that, consequently, under the express terms of the charter, the charterer during these days was not bound to receive 500 tons per day, and that the lay days were thereby extended. It further appears that on the 24th and 25th of December the master was allowed to load nitrate for the benefit of the owner, under an agreement that the amount of coal which the charterer should be bound to receive should be measured by what the ship was able to discharge, and that the lay days should be extended accordingly. When the discharge of the cargo was complete, the master entered into an agreement with the charterer's agents settling the uncertainty as to the lay days and adjusting the matter of dispatch on the basis of the time saved in the total unloading at both ports. By the terms of this settlement, it was agreed that the owner should pay dispatch money for 2 days and 6 hours, and draft was given for $2,561.76, which was accepted and retained by the charterer. At the same time the master delivered to the charterer's agents an instrument, acknowledging the redelivery of the ship, and stating that all conditions of the charter party had been complied with, reserving for future determination only the question of liability on certain accounts signed by the master "for the charterer's account."

[8, 9] As shown above, this settlement, agreed upon between the master and charterer's agents, was substantially in accordance with the legal rights of the parties. It seems to have been a fair and just settlement, and we see no reason why all parties are not bound thereby. The master has authority to bind the owner in a settlement of this kind. Burrill v. Crossman (D. C.) 65 F. at 109; Id., 91 F. 543, 33 C. C. A. 663, 179 U. S. 100, 21 S. Ct. 38, 45 L. Ed. 106; Holland Gulf Steamship Co. v. Hagar (D. C.) 124 F. 460; The Gulnare (C. C.) 24 F. 487. And, even if he were lacking in authority, the owner has ratified the settlement by pleading it as a defense. Likewise the charterer has ratified the action of its agents in making the settlement by accepting and retaining the dispatch money paid thereunder, and not questioning the settlement for more than a year afterward. We hold, therefore, that, as the parties have settled the questions of dispatch and demurrage at Iquique and Antofagasta, and as there has been a final accord and satisfaction of their conflicting claims and demands regarding same, neither is entitled to recover anything further on account thereof.

[10] When the coal was being delivered at Iquique, the charterer had talleymen and checkers on board the vessel who were furnished meals, for which claim is made on behalf of the owner. The District Judge allowed the owner $34.47 on this account, and we think that this is correct. There is nothing in the charter which obligated the owner to furnish meals to the employees of the charterer.

[11, 12] The claim of the charterer for advancements made on behalf of the ship embraces wages paid tallymen and checkers at Iquique and Antofagasta and the cost of sacks in which the coal was delivered at Iquique, together with $34.50, agency fee. The liability for the agency fee is not disputed on the part of the owner, and was awarded charterer by the District Judge. The claim for wages paid talleymen and checkers and for the cost of sacks cannot be allowed. There is nothing in the charter which obligates the owner to pay the wages of the tallymen and checkers, who were employed by the charterer for its own purposes, or to furnish the sacks in which the coal was delivered at Iquique. It is true that the charterer proved a custom of the port to deliver coal in sacks, and that the railway company would not accept it otherwise. This custom, of course, imposed upon the vessel the duty of making delivery in sacks, but not the duty of furnishing them free of cost to the charterer.

From what has been said, it follows that the owner is entitled to recover of the charterer the sum of $473.34 on account of excess dispatch money deducted at Norfolk, together with $34.47 for meals furnished at Iquique, subject to a deduction of the $34.50 agency fee allowed the charterer, making the total of the recovery by the owner $473.31, with interest thereon from November 13, 1920. The decree of the District Court will be modified accordingly, and the costs of this court, including the cost of the transcript of the record, will be equally divided between the owner and the charterer.

Modified.