BRITAIN S. S. CO. v. GEORGE E. WARREN CORPORATION.

No. 667.

District Court, D. Massachusetts.

Jan. 31, 1938.

G. Philip Wardner, of Boston, Mass., for libelant.

Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass. (Whiting Willauer, of Boston, Mass., of counsel), for respondent.

McLELLAN, District Judge.

This libel involves the right to dispatch money for time saved in loading and discharging a ship. The libelant, a British corporation, is the sole owner of the British steamship Dartford. The respondent is a Massachusetts corporation having its usual place of business in Boston.

By a charter party dated April 15, 1935, the libelant chartered the steamship to Amtorg Trading Corporation to carry a cargo of 6,000 tons (10 per cent. more or less in owner's option) of coal from Mariupol, Nicolaieff, or Theodosia at charterer's option, to "one or two ports northern range, U. S. A. * * * as ordered on signing bills of lading" for a freight of 10 shillings, 7½ pence if loaded at Mariupol, or 10 shillings, 4½ pence if loaded at Nicolaieff or Theodosia per ton of 2,240 pounds or 1,016 kilograms. Bills of lading, dated April 28, 1935, and signed by the master of the steamship Dartford, were issued at Mariupol, acknowledging the receipt from Amtorg Trading Corporation of a specified amount of coal to be delivered at Boston to Amtorg Trading Corporation, "freight, all conditions and exceptions per unit delivered and charges, if any, as per margin, as per charter party dated 15 April 1935." The cargo was consigned by the charterers to the respondent, which, under its contract with Amtorg Trading Corporation, was obligated to make settlement directly with said steamer, and any dispatch earned by the respondent at the discharging port was for its own account.

The pertinent portions of the charter party follow:

"5. Cargo to be loaded at the average rate of 600 tons per weather working day, Sundays, official and local holidays excepted whether used or not. * * *

"Time to commence at 1 P.M. if notice of readiness to load is given before noon and at 6 A.M. next working day if notice given during office hours after noon.

"Saturdays and days preceding general or local holidays to count only as ¾ of a day whether used or not.

"On Monday and the day after general or local holidays time not to count until 8 A.M. whether used or not. * * *

"6. At U.S.A. ports steamer to be discharged at the average rate of 800 tons per weather working day, Sundays, official and local holidays excepted whether used or not, and cargo to be received by merchants from steamer's hold free of expense to the steamer (free out).

"Time to commence at 1 P.M. if notice of readiness to discharge is given before noon and at 6 A.M. next working day if notice is given during office hours after noon.

"7. Ten running days on demurrage at the rate of 30 lbs. per day or pro rata for any part of a day payable day by day to be allowed merchants altogether at ports of loading and discharging. Detention over demurrage payable at 10% above the charter party rate for demurrage. * * *

"17. Time allowed for loading and discharging as per clauses 5 and 6 to be reversible or to be settled at each end if required by charterers.

"18. Lay days not to commence before 25th April 1935 unless with charterer's consent. * * *

"21. Owners to pay to charterers dispatch money at half demurrage rate for all time saved in loading and/or discharging."

An agreed statement is on file and the facts are as stated therein.

The following facts, which appear either by admission in the pleadings or in the agreed statement, suffice to disclose the nature of the principal questions involved:

The charterer exercised its option to load at Mariupol, and also its option, found in clause 6 of the charter party, to load at not less than 1,000 tons per day. The Dartford arrived at Mariupol on April 24, 1935, and gave notice in writing before noon of the same day of readiness to load. Under the terms of the charter party, however, lay time did not begin until 6:00 a.m. on Thursday, April 25, 1935. The Dartford loaded 6,050 tons of coal and finished loading at 5:00 p.m. on Sunday, April 28, 1935. It is agreed that the vessel's lay time under the charter party was 6 days and one hour; that her actual loading time was 3 days, 11 hours; and that the lay time used was 2 days and 12 hours.

The Dartford arrived at Boston on Saturday, May 25, 1935, and at 9:00 a.m. on Monday, May 27th, gave notice in writing of readiness to unload. The Dartford actually began to discharge her cargo at 8:00 a.m. on Monday, May 27th, and under the terms of the charter party her lay time began at 1:00 p.m. on the same day, and was for a period of 7 days, 13½ hours. The Dartford finished discharging at 8:00 p.m. on Friday, May 31st.

Upon the completion of the loading, the master signed without protest a time sheet showing 8 days and 8 hours time saved at the loading port. A copy of this sheet is annexed to the agreed statement of facts, and is referred to in greater detail below. The charterer did not exercise its option, found in clause 17 of the charter party, to require time allowed for loading and discharging to be settled at each end. It is agreed, therefore, that under the "reversible" provision of that clause, that to the lay time allowed for discharging, a certain amount of time must be added for time saved in loading. This amount is one of the questions in dispute between the parties. Upon completion of the discharge, the master, under protest, signed a time sheet showing a dispatch of 19 days, 14 hours, and 30 minutes, a copy of which is annexed to the agreed statement of facts. The respondent held back from the freight money which it was obligated to pay a sum for dispatch based upon this reckoning, and the owners of the vessel have brought this suit to recover the difference between the amount so held back and the amount which would have been payable for dispatch under their theory as to the proper construction of the charter.

It is further agreed, if it be material, that on Saturday afternoon some businesses are open, such as stores; some are closed, such as banks. Steamship offices are closed. Some unloading is done on Saturday afternoon in the port of Boston, but when it is done, overtime is paid.

The first question raised by these facts is whether, under clause 21, providing "owners to pay charterers dispatch money * * * for all time saved in loading and/or discharging," the phrase "time saved" means lay days saved or time saved to the ship. The libelant contends that it means only the difference between the time allowed by the charter for loading or unloading and the amount of such time actually used. For example, if the charter provided for 5 lay days and 4 were used, the time saved amounts to one day, according to the libelant's contention. The respondent, on the other hand, says that "time saved" means all time saved to the ship, or in other words, the difference between the date when the ship was actually ready to leave, and the date when the lay time would have expired had the charterers chosen to retain the vessel that long.

Since this charter party was entered into in England, the construction of its terms must be determined by the law of England. Gaston, Williams & Wigmore of Canada, Ltd., v. Warner, 260 U.S. 201, 43 S.Ct. 18, 67 L.Ed. 210; Yone Suzuki v. Central Argentine Railway, 2 Cir., 27 F.2d 795.

The parties have cited the following English cases bearing on the question: Laing v. Hollway, [1878] 3 Q.B.D. 437; The Glendevon, [1893] P.D. 269; Nelson Sons, Ltd., v. Nelson Lines Liverpool, [1907] 2 K.B. 705; In re Royal Mail Steam Packet Company v. River Plate Steamship Company, [1910] 1 K.B. 600; Mawson Steamship Company v. Beyer, [1914] 1 K.B. 304. These I treat as evidence upon which I am to find the English law as a fact.

In Laing v. Hollway, supra, a charter party provided: "Demurrage if any, at the rate of 20s. per hour, except in case of any hands striking work, frosts or floods, revolution or wars, which may hinder the loading or discharge of the vessel. Despatch

money 10s. per hour on any time saved in loading and discharging." Four days were saved in loading, and five in discharging. The plaintiff admitted that dispatch was payable for nine days, but contended that such dispatch was payable only at the rate of 10s. per hour for a working day of 12 hours. The defendant deducted dispatch figured on a basis of a 24-hour day, and the plaintiff brought suit for the difference. The court below decided in favor of the plaintiff, but its decision was reversed in the Court of Appeal. Bramwell, L.J., in delivering the opinion of the court, said of the meaning of the phrase "time saved":

"Then, what is the meaning of 'time saved in loading or discharging?' The literal meaning we suppose would be doing those things in less time than they might be done in with ordinary despatch, i. e., if ordinary despatch with the number of hands and ordinary diligence would load and unload in twenty days or 240 hours, then extraordinary despatch,—extraordinary number of hands, and extraordinary diligence—in doing those things in fifteen days or 180 hours, the difference five days, or sixty hours, is time saved. Because, strictly speaking, time is not saved in doing a thing by working twenty-four hours round instead of twelve in one day and twelve another; twenty-four have been consumed in each case. Time is saved by getting from A to B if a man runs in one hour instead of walking in two. But nobody suggests that this is the meaning. It is admitted on both sides, and is clear, that 'time saved' means if the ship is ready earlier than she would be if the charterers worked up to their maximum obligation only, all the time by which she is sooner ready is time saved within the meaning of the charter party."

In The Glendevon, [1893] P.D. 269, a steamer was chartered to carry a cargo of coal from Newcastle to Lisbon. The charter party provided that: "The steamer to be discharged at the rate of two hundred tons per day weather permitting (Sundays and Fete Days excepted) according to the custom of the port of discharge and if sooner discharged to pay at the rate of 8s. 4d. per hour for every hour saved. * * * Demurrage twenty pounds for every day's detention in discharging and in same proportion for any part of such day over and above the days allowed as foresaid except in case of riot or any hands

striking work frost snow or floods or other accidents which may prevent the discharging of such steamer." The question presented was whether a Sunday and a Fete Day occuring during the lay period should be included in calculating dispatch. The court here held that they should not be included, and that dispatch was payable only for working days saved.

In Nelson Sons, Ltd., v. Nelson Lines Liverpool, [1907] 2 K.B. 705, the cause of action arose out of an agreement in the nature of a charter party under which the steamers of the defendant line were to carry cargos of frozen meat from the River Plate to England. The agreement provided: "Seven weather working days (Sundays and holidays excepted) to be allowed by owners to charters for loading. * * * For any time beyond the periods above provided the charterers shall pay to the owners demurrage at the rate of 40£ per day, and so in proportion for any part of a day, payable day by day. For each clear day saved in loading the charterers shall be paid or allowed by the owners the sum of 20£." In the course of arbitration proceedings under this agreement, a dispute arose as to whether dispatch was payable for subsequent Sundays or holidays falling within the lay period as time saved. The arbitrator, on the authority of The Glendevon, supra, held that for the purposes of dispatch money the charterers could only "save" days on which they could require the ship to work, and not for Sundays or holidays. This decision was affirmed by the Divisional Court, and was then heard by the Court of Appeal, which reached the same conclusion by a majority of two to one. Buckley, L.J., speaking for the majority, said:

"By finishing their loading on the Saturday the charterers saved the shipowners delay, but there was no day saved in loading so far as Sunday was concerned. The relevant words are 'seven days to be allowed for loading,' and 'for each clear day saved in loading' the charterers shall be paid. In this language no trace is to be found of saving delay to the ship. The payment is to be made for any saving effected in the seven days allowed for loading. This conclusion is in accordance with the decision in The Glendevon, which in my opinion, was rightly decided."

Fletcher Moulton, L. J., read a dissenting opinion.

In Royal Mail Steam Packet Company v. River Plate Steamship Company, [1910] 1 K.B. 600, it was held that where a charter party provided "the owners of the ship to pay 10£ per day despatch money for each running day saved," the phrase must refer to time saved to the ship. The court reviewed the cases considered above, and speaking of the Nelson Case, said: "I must confess that the judgment of Fletcher Moulton, L.J. strongly commends itself to me and that I agree with the reasons given by him." The court then held that the words "running days" mean consecutive days, and that therefore the Nelson Case is inapplicable to the facts presented.

In Mawson Steamship Company v. Beyer, [1914] 1 K.B. 304, a charter party provided: "Clause 6. The entire cargo shall be loaded at the average rate of 500 units per running day of twenty-four consecutive hours (Sundays and non-working holidays excepted). * * *" Clause 9 provided that if the steamer should be longer detained than the time stipulated, as above mentioned, demurrage should be paid. By clause 24 it was provided: "Owners agree to pay charterers 10£ (say ten pounds) per day for all time saved in loading." The question presented to the Divisional Court in the form of a special case from an umpire was whether dispatch was payable for a Sunday saved, the question being substantially identical with that now before this court. The Divisional Court held that dispatch must be paid also for the Sunday saved to the ship. In his opinion, Bailhacke, J., after reviewing the four cases set forth above, and criticizing the decision of the Court of Appeal in the Nelson Case, said that the effect of that decision is limited to cases where the provision for dispatch is found in the same clause with the provisions for lay days, where it might be argued that the words "time saved" were, because of their context, limited in their application to lay days as there defined. At page 312 the court said:

"Accepting, however, as I must do, the authorities as they stand, I think I may with safety say that the conclusions to be drawn from them are:

"1. Prima facie the presumption is that the object and intention of these despatch clauses is that the shipowners shall pay to the charterers for all time saved to the ship, calculated in the way in which, in the converse case, demurrage would be calculated; that is, taking no account of the lay day exceptions: Laing v. Hollway and In re Royal Mail Steam Packet Co. and River Plate Steamship Co.

"2. This prima facie presumption may be displaced, and is displaced, where either (1.) lay days and time saved by despatch are dealt with in the same clause and demurrage in another clause: The Glendevon; (ii) lay days, time saved by despatch, and demurrage are dealt with in the same clause, but upon the construction of that clause the Court is of opinion, from the collocation of the words or other reason, that the days saved are referable to and used in the same sense as the lay days as described in the clause, and are not used in the same sense as days lost by demurrage: Nelson & Sons v. Nelson Line, Liverpool."

The court then decided that in the case before it there was nothing to rebut the presumption that time saved to the ship was intended, and held accordingly.

No later English cases bearing on this question have been cited by counsel.

Since, in the present case, lay days, dispatch, and demurrage are dealt with in separate clauses, the Mawson Case is applicable. Since that well-reasoned decision is the latest one before me, and since it is there decided expressly that the Nelson Case, while binding upon the court, is not applicable to a charter party such as that now before this court, I must follow it. I find, therefore, that by the law of England a proper interpretation of the dispatch clause in this charter party is that dispatch is payable for all time saved to the ship, including Sundays and holidays.

The next question to be decided is the effect upon the rights of the parties of the provisions of clause 17 of the charter party to the effect that, "Time allowed for loading and discharging * * * to be reversible or to be settled at each end if required by charterers." The parties made no formal offer in evidence of any of the British decisions bearing upon this question. In their briefs, however, they cite certain authorities which, so far as they apply and are of assistance, I have considered. The authorities cited are: Love & Stewart, Ltd. v. Rowton Steamship Company, Ltd., [1916] 2 A.C. 527; Rederiaktiebolaget-Transatlantic v. La Compagnie Francaise Des Phosphates De L'Oceanie, 32 Com. Cases 126, Court of Appeal, 1926; Rowland & Marwood's Steamship Com-

202

pany, Ltd., v. Wilson Sons Company, Ltd., 2 Com.Cas. 198, Q.B.1897; Oakville Steamship Company v. Holmes, 5 Com.Cas. 48, Q.B.1899.

In dealing with this question as to the meaning of the "reversible" clause, I feel bound by the stipulated facts, paragraph 16, to treat this question as involving the number of days, hours and minutes saved in loading which may be added to the lay time allowed by the charter party in discharging. This paragraph reads:

"16. The charterer did not under clause 17 of the charter party require the time for loading and discharging to be settled at each end. To the lay-time allowed by the charter party discharging is to be added a certain number of days, hours and minutes on account of time saved at the loading port. The amount of time which should be so added is in dispute between the parties."

The respondent paid on the basis that time saved to the ship in loading is, as it were, to be carried over to the port of discharge and there transmuted into lay days. The libelant contends that only lay days are to be brought over to the port of discharge and added to the lay days for unloading. It is one thing to say that dispatch means time saved to the ship, and another thing to say that in reckoning dispatch, time saved to the ship in loading should be treated as lay days in determining what time was in fact saved to the ship in discharging. It has been held in England that the word "reversible" contained in a similar context in a charter party signifies that any time saved in loading may be added to the time allowed for discharging and vice versa. See Love & Stewart, Ltd., v. Rowton Steamship Company, Ltd., supra; Rederiaktiebolaget-Transatlantic v. La Compagnie Francaise Des Phosphates De L'Oceanie, supra. It does not follow, however, as stated above, that for the purposes of such a reversible clause, time saved need necessarily be computed in the same way as for the purposes of a dispatch clause. The two types of clauses are in no way dependent upon each other. Either could be included in a charter party without the other.

In Rederiaktiebolaget-Transatlantic v. La Compagnie Francaise Des Phosphates De L'Oceanie, supra, by a charter party dated January 20, 1925, the plaintiffs as owners chartered a steamship to the defendants to go to a port in French Oceania, and bring back a cargo of phosphates. Clause 10 of the charter party provided: "Cargo to be supplied at the average rate of 400 tons per working day of 24 consecutive hours, Sundays and Holidays excepted and weather permitting, time counting both in loading and discharging from the date of the steamer being in the loading or discharging berths as ordered and ready to receive or deliver cargo, and 24 hours written notice to that effect. * * * in the event of any delay or hindrance in procuring or * * * shipping the cargo by reason of * * * rain * * * bad weather * * * strikes * * * lay days not to count during the period of such delay or hindrance and demurrage not to accrue. * * * At charterer's option any days or parts of days not consumed in loading may be added to the time for discharging, and any extra time consumed in loading may be deducted from the time for discharging." Clause 11 provided that demurrage over and above the lay days so calculated should be payable at the rate of 50£ per day, and clause 13 provided that dispatch money was to be paid by the steamer at the rate of 20£ per day for all time saved in loading or discharging, including Sundays and holidays saved. In loading, the lay days expired at noon, November 4. The steamer did not finish loading until 6:00 p.m., November 26, being 22 running days and 6 hours. Of these, roughly 12 were working days, 3 were Sundays, and 7 were days when working was prevented by the weather. The court held that in computing the total lay period for discharging, only working days should be deducted. It is to be noted that in computing demurrage, both working days and Sundays would have been counted under the terms of the charter, although days on which weather conditions prevented work were specifically excepted from demurrage. In his opinion, Scrutton, L. J., said:

"But the question of demurrage appears to me to be a different question; demurrage does not begin till you have exhausted the lay days; and the lay days are to exclude Sundays, Holidays and non-weather working days. It seems to me therefore, you can only increase or decrease the 'pool' of lay days by adding or deducting days of the same character: and cannot use a non-weather working day on which neither the charterer nor the ship is bound to work to deprive the charterer of a day for discharging which he is en-

titled to require to be a weather working day."

My conclusion is that under a charter giving the charterer an option similar to the present one, the charterer electing to "pool" the lay days, he is only entitled to add to the lay days allowed for discharging lay days saved in loading. Accordingly, only 3 days, 13 hours, may be added to the lay days allowed for discharging.

■ It has been argued that the shipowners are bound by a so-called "time sheet" signed by the master at Mariupol. This document, after showing the actual lay time used to be 2 days, 12 hours, proceeds: "Time saved to steamer (Incl. 7 hrs. on Sun. 28th April; 8 hrs. on Monday 29th April and 6th May; 6 hrs. on Tues. 30th April. Two official holidays 1st and 2nd May, 8 hrs. on Fri. 3rd May, 6 hrs. on Sat. 4th May and one Sunday 5th May 1935) 8 d. 8 hrs. Say; Eight days and eight hours saved to steamer in loading in the port of Mariupol, settlement for which to be effected in the port of discharge, on reversible basis, as per Charter party. (s) E. H. Dagnall, Master of the s/s 'Dartford.'" This document is merely a statement of time saved to the ship. It does not purport to alter the rights of the parties under the charter party. It merely sets forth facts. There was no evidence of change of position such as might give rise to an estoppel, should that be material. No attempt appears to effect a settlement of the whole question of amounts due for dispatch, such as appears in South American Metal Company v. Kjoge, 4 Cir., 12 F.2d 562, cited by the respondent.

■ If the time sheet should be construed as an attempt to alter the rights of the parties under the charter, the shipowners would not be bound by the action of the master in that regard. The master of a vessel ordinarily has no authority to alter the terms of a charter party. See Gracie v. Palmer, 8 Wheat. 605, at page 639, 5 L.Ed. 696.

■ The final question is whether the phrase used in clause 6, "Sundays, Official and local holidays excepted whether used or not," includes Saturday afternoon at Boston. This is material in the view that I take of the first question, since if Saturday afternoons are excepted from the lay period, then they affect the "dispatch." It is not contended that Saturday afternoon is a local holiday by the law of Massachusetts. It is agreed, on the other hand, that many businesses, including banks and steamship offices, are closed, and that it is necessary to pay overtime for work done on the water front at Boston on Saturday afternoons. Since there is no question of local law making Saturday afternoon a holiday, I think the question may well be one of construction, similar to those previously considered, and hence governed by English law. If so, Love & Stewart, Ltd., v. Rowton Steamship Company, Ltd., [1916] 2 A.C. 527, appears to me to be decisive of the question. In that case, the phrase used was, "Sundays, general or local holidays (unless used) in both loading and discharging excepted." The court decided that Saturday afternoon was not within the above phrase, Lord Sumner saying, at page 536:

"Saturday afternoons are the more plausible of the two, but the exception in the charter is clearly based on days, not parts of days. I do not think that the term extends to the latter part of a weekday, on which it is usual not to work, although we call it and enjoy it under the name of a Saturday half-holiday. Really it is a half-day, which while it lasts is wholly holiday, and I do not think that 'general or local holidays' cover it."

If this question is not to be determined by English law under the circumstances here presented, the result is the same, for upon the agreed facts and in the absence of statute I do not regard Saturday afternoon as a local holiday under the American decisions. See Pool Shipping Company, Ltd., v. Samuel, 3 Cir., 200 F. 36. See also reference to *Saturday* in the loading clause of the charter party.

Upon the basis of the findings that "time saved" as used in the dispatch clause means time saved to the ship, that the "reversible" clause permits only lay days saved in loading to be added to lay days for discharging, that Saturday afternoon is not a local holiday within the meaning of the charter party, and that what the master signed does not change the situation, the conclusion is that the libelant is entitled to recover a part of what it seeks. The amount of such recovery is such as may be agreed upon by the parties upon the basis of the above findings, and in the event they cannot agree, a further hearing may be had for the purpose of deciding the question of damages.